SHAARE TEFILA CONGREGATION, individually, and on Behalf of its members; Rabbi Martin S. Halpern; Shirley Altman; William Harkaway; Marshall S. Levin; Maurice Potosky and Dr. Jacob Teller, Appellants,

and

Aetna Casualty & Surety Company, Plaintiff,

v.

John William COBB; William Randall Harris; Thomas Lloyd Heine; William Hess; Thomas Joseph Hunt, Jr.; Raymond Lee Jordan; Dominic Queen and Michael David Remer, Appellees.

No. 85–1544.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 5, 1985.

Decided March 7, 1986.

Patricia A. Brannan (William A. Bradford, Jr., Daniel S. Cohen, Steven P. Hollman, P. Dustin Finney, Jr., Hogan & Hartson, Washington, D.C., Irvin N. Shappell, Jewish Advocacy Center on brief), for appellants.

Deborah T. Garren (Robert B. Barnhouse, Piper & Marbury, Baltimore, Md., Joseph M. Niland, Upper Marlboro, Md., on brief), for appellees.

Before HALL, MURNAGHAN, and WILKINSON, Circuit Judges.

K.K. HALL, Circuit Judge:

Shaare Tefila Congregation and individual representatives of the class comprised of its members and employees appeal from the district court's order dismissing their action against defendants.[1] Plaintiffs brought this action pursuant to 42 U.S.C. §§ 1981, 1982 and 1985(3) and the Maryland common law of trespass, nuisance, and intentional infliction of emotional distress. We affirm.

I.

Shaare Tefila Congregation is a Jewish community of approximately 500 member families, who assemble at their synagogue in Silver Spring, Maryland, in order to worship and engage in community activities. On the evening of November 2, 1982, members and employees of Shaare Tefila Congregation met at the synagogue for activities, including a board of directors' meeting. Marshall S. Levin, the Executive Director of Shaare Tefila Congregation, remained at the synagogue after the meeting. There, he received a telephone call from Dr. Jacob Teller, one of the board members, informing him that Teller's car had been spray-painted with a swastika while parked at the synagogue for the meeting. When Levin went outside to search for possible further damage, he discovered that the white outside walls of the synagogue had been spray-painted in red and black with large anti-Semitic slogans

---

1. Defendants are private individuals who allegedly vandalized plaintiffs' synagogue.

and symbols, which included the words "Death to the Jude," "In, Take a Shower Jew," "Toten Kamf Raband," and "Dead Jew," swastikas, a skull and cross bones, and Ku Klux Klan symbols.

On March 16, 1984, Shaare Tefila Congregation and several of its members and employees (the "Congregation") filed this civil rights class action against defendants in federal district court. In its complaint, the Congregation alleged violations of 42 U.S.C. §§ 1981, 1982, and 1985(3) and the Maryland common law of trespass, nuisance, and intentional infliction of emotional distress.

Before the completion of discovery, one of the defendants filed a motion under Fed. R.Civ.P. 12(b)(1) and (6) to dismiss the complaint. The district court granted the motion. The Congregation's section 1981 claim, alleging that defendants' conduct deprived plaintiffs of the full and equal benefit of the laws, was dismissed on the ground that it did not involve any state action. *Shaare Tefila Congregation v. Cobb*, 606 F.Supp. 1504, 1506–07 (D.Md. 1985). The district court dismissed the Congregation's section 1982 claim after concluding that discrimination against Jews is not race discrimination within the meaning of the statute. *Id.* at 1507–09. The court refused to adopt the Congregation's position that the racial animus requirement of section 1982 is satisfied if defendants are motivated by a perception that plaintiffs are racially distinct, reasoning that such a position relies "entirely on the idiosyncracies of individual defendants." *Id.* at 1508.

In view of its dismissal of appellant's claims under sections 1981 and 1982, the district court also dismissed the Congregation's section 1985(3) claim insofar as it alleged a conspiracy to deprive appellant of rights under sections 1981 and 1982. *Id.* at 1509. The district court further held that neither the federal constitutional right to interstate travel nor the various state rights asserted by appellant could support a cause of action under section 1985(3). Specifically, the court found that appel-

lant's claim concerning the right to interstate travel was based on conclusory allegations and that section 1985(3) reaches only federal—not state—rights. *Id.* at 1509–10.

Because of its dismissal of all of the Congregation's federal claims, the district court also dismissed the pendent state claims. *Id.* at 1510. In addition, although the motion to dismiss was filed on behalf of only one defendant, the district court found that its rulings required dismissal of the entire action against all of the defendants. *Id.*

This appeal followed.

## II.

On appeal, the Congregation contends that the district court erred in dismissing its claims under sections 1981, 1982, and 1985(3). We disagree.

Section 1981 provides, in pertinent part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

With respect to its section 1981 claim, the Congregation alleged in its complaint that "[d]efendants' desecration of the synagogue ... deprived plaintiffs of the full and equal benefit of laws for the security of persons and property. Defendants' desecration ... was motivated by racial prejudice in that defendants perceive plaintiffs as racially distinct because they are Jews."

The Congregation acknowledges on appeal that no state action was involved in defendants' acts. It maintains, however, that the district court erred in concluding that state action is required in order to bring a "full and equal benefit" action under section 1981. We, however, agree with the Third Circuit's interpretation of the "full and equal benefit" clause of section 1981 and conclude that state action is re-

quired in order to assert a claim under that statute. *See Mahone v. Waddle,* 564 F.2d 1018 (3d Cir.1977), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978).

In *Mahone,* the Third Circuit distinguished the "full and equal benefit" clause of section 1981 from the "contracts" clause of that statute. It noted that the right "to make and enforce contracts" was by nature concerned with relationships between private parties, and a prohibition against race discrimination in the private sector was readily implied. On the other hand, the Third Circuit stated:

> The words "full and equal benefit of all *laws and proceedings* for the security of persons and property" (emphasis supplied) ... suggest a concern with relations between the individual and the state, not between two individuals. The state, not the individual, is the sole source of law, and it is only the state acting through its agents, not the private individual, which is capable of denying to blacks the full and equal benefit of the law. Thus, while private discrimination may be implicated by the contract clause of section 1981, the concept of state action is implicit in the equal benefit clause.

*Id.* at 1029. Because appellant's section 1981 "full and equal benefit" claim does not involve any state action, we find that the district court did not err in dismissing that claim. Moreover, for the reasons discussed in the next section, we conclude that the requisite racial motivation to sustain a section 1981 claim was lacking.

### III.

Next, the Congregation alleges that the district court erred in dismissing its section 1982 claim. Section 1982 states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Appellant's section 1982 claim, as stated in its complaint, was that "[d]efendants' desecration of the synagogue ... deprived plaintiffs of the right to hold real and personal proper-

ty. Defendants' desecration of the synagogue was motivated by racial prejudice in that defendants perceive plaintiffs as racially distinct because they are Jews."

■ Appellant argues that the district court's dismissal of its section 1982 claim is erroneous as a matter of law because defendants' desecration of the synagogue had a racial character, was motivated by racial animus and, thus, is actionable under section 1982. The Congregation maintains that Jews are not members of a racially distinct group and do not wish to be so considered. It nevertheless argues that because defendants viewed Jews as a racially distinct group, defendants' acts constituted racial discrimination in violation of section 1982. In support of its argument, the Congregation relies upon the Tenth Circuit's decision in *Manzanares v. Safeway Stores, Inc.,* 593 F.2d 968 (10th Cir.1979). We reject appellant's contentions and find nothing in the statute, its legislative history, or subsequent case law which would lead us to conclude that section 1982 was intended to apply to situations in which a plaintiff is not a member of a racially distinct group but is merely *perceived* to be so by defendants. We conclude that *Manzanares* is, if correct at all, inapposite.

*Manzanares* involved a section 1981 action brought by a plaintiff of Mexican-American descent against his employer and labor union, alleging that he was discriminated against due to his race and/or national origin in that he was treated differently from Anglo-Americans. The Tenth Circuit concluded that "section 1981 is directed to racial discrimination primarily, but is not necessarily limited to the technical or restrictive meaning of 'race,'" *id.* at 971, and held that the plaintiff's contentions were sufficient to state a claim under section 1981. Appellants urge us to extend the Tenth Circuit's reasoning here. We decline to do so. *Manzanares* did not hold that a defendant's mere perception of a plaintiff as racially distinct is sufficient to constitute racial discrimination in violation of section 1981. Instead, the Tenth Circuit emphasized that Mexican-Americans, as a

group, are commonly treated differently from Anglo-Americans, as a group. We do not find the position of Jews in this society to be analogous to that of Mexican-Americans or others commonly considered to be non-whites.

Although we sympathize with appellant's position, we conclude that it cannot support a claim of racial discrimination solely on the basis of defendants' perception of Jews as being members of a racially distinct group. To allow otherwise would permit charges of racial discrimination to arise out of nothing more than the subjective, irrational perceptions of defendants. Such perceptions are not what section 1982 was intended to protect against. Because discrimination against Jews is not racial discrimination, and the Supreme Court has stated that section 1982 does not address discrimination on account of religion or national origin, *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968), we find that the district court properly dismissed the Congregation's section 1982 claim.

### IV.

Appellant's last contention is that the district court erred in dismissing its section 1985(3) conspiracy claim.[2] In that claim, the Congregation alleged, *inter alia*, the following:

> By conspiring to and desecrating the synagogue ... defendants conspired for the purpose of depriving, either directly or indirectly, the class of members of ... [the] Congregation of the equal protection of the laws or of equal privileges and immunities under the laws, including, but not limited to, plaintiffs' federal constitutional right to travel, 42 U.S.C.

§§ 1981 and 1982, ... Maryland criminal laws prohibiting destruction of property and conspiracy to destroy property, and Maryland common law prohibiting trespass, nuisance and intentional infliction of emotional distress.

On appeal, the Congregation asserts that its section 1985(3) claim should not have been dismissed, because it stated valid causes of action under sections 1981 and 1982. In addition, appellant argues that the district court erred in holding that its complaint failed to support a cause of action under section 1985(3) based on its federal constitutional right to interstate travel. The Congregation maintains that from its allegations in the complaint as to the location of the synagogue, the residency of the synagogue's members, the conduct of the defendants, and the effect of that conduct on appellant, a finder of fact could conclude that the purpose and effect of defendants' conspiracy was to deprive congregants of their right to engage in interstate travel. Finally, the Congregation disputes the district court's conclusion that appellant did not state a section 1985(3) claim for violation of its rights under Maryland law. It asserts that state law rights are appropriate rights upon which to base violations of section 1985(3).

The Congregation cannot base its section 1985(3) claim on sections 1981 and 1982, because, for the reasons discussed in the preceding sections of this opinion, it failed to state causes of action under those statutes. We reject appellant's remaining contentions as to its section 1985(3) claim upon the reasoning of the district court. *Shaare Tefila Congregation*, 606 F.Supp. at 1509–10.

**2.** Section 1985(3) provides in pertinent part, the following:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

## V.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

MURNAGHAN, Circuit Judge, concurring.

Bearing in mind that hard cases pose the risk of making bad law the present controversy constitutes a hard case. The behavior of which the defendants stand accused was execrable. In also reaching the conclusion Judge Hall has expressed, I nevertheless steadfastly hope that, if the allegations are supported by proof, stern retribution under the laws of Maryland will be meted out to the defendants.

Yet the law is grounded on facts, not on misperceptions of fact. For persons of the ilk which the defendants, at the present posture of the case, are revealed to be to have the power to confer jurisdiction on the federal courts would, in all probability, lead to very regrettable consequences.

I think not only of Jews and the regrettable indignities they may well have suffered here at the hands of the defendants. I cannot say that my sympathies for the first time go out to them only because those sympathies have already gone out to the Jews long ago and on many occasions as bad as or far worse than the instant one.

My ethnic origins are principally Hibernian. On March 17, for one group of Irish hotheads and on July 12 for another (as well as other dates during the year), violence deriving from misperceptions, of Catholics on the one hand, or of Protestants on the other, as an inferior human sort or race has broken out, to my everlasting regret from time to time. Yet it will but contribute to disruption of our nation to accord such ill mannered and unreasoned fracases the dignity of status as civil rights

controversies. They belong in the state courts, where justice, more immediate and more personalized, is likely to be at hand.

Accordingly, I concur in the conclusion that 42 U.S.C. §§ 1981, 1982 and 1985(3) do not afford a basis for bringing suit in the circumstances here involved.

WILKINSON, Circuit Judge, concurring in part, dissenting in part:

I cannot accept the majority's view that the civil rights statutes invoked here fail to protect against racial discrimination based on "nothing more than the subjective, irrational perceptions of defendants." *Ante* at 527. All racial prejudice is the result of subjective, irrational perceptions, which drain individuals of their dignity because of their perceived equivalence as members of a racial group. The Civil Rights Acts of 1866 and 1871 were enacted precisely to halt the spread of violence and hatred by those motivated by such perceptions, and plaintiffs in this case, no less than those in the usual racial discrimination case, have suffered the consequences of abhorrent notions concerning racial identity and its relevance. Rather than allowing ignorance and misperception to provide their own defense, I would find the erroneous but all too sincere view of defendants that Jews constitute a separate race worthy of humiliation and degradation sufficient to bring the claim within 42 U.S.C. §§ 1982 and 1985(3).[1]

## I.

Because the majority opinion leaves the impression that the incident at issue here was an isolated event with only speculative racial overtones, it is necessary to examine the broader context in which the desecration of Shaare Tefila Synagogue occurred. The posture of this case, of course, requires that we take the allegations of the

1. I agree with the majority that the "full and equal benefit" clause of 42 U.S.C. § 1981 requires state action, and accordingly join in part II of its opinion. It should be noted, however, that my discussion of racial discrimination under § 1982 applies with equal force to § 1981 where other predicates for § 1981 coverage are

established. I too would affirm the district court's conclusion that § 1985(3) actions may not be grounded solely in violations of state law. Because I disagree with the view that § 1982 does not apply, however, I would reinstate plaintiffs' § 1985(3) conspiracy claim to the extent it alleges a conspiracy to violate § 1982.

complaint as true and consider only the legal adequacy of the facts as alleged. Here, we find that defendants' activities on the evening of November 1, 1982 started when they gathered behind a Drug Fair store at a shopping center in Silver Spring, Maryland. While the eight defendants drank and talked, they spray painted the outside walls of the store with anti-Semitic slogans and symbols, including "Arian [sic] Brotherhood," "White Power," "KKK," an eagle with a swastika, and a Star of David with an arrow through it. Defendants also painted their initials on the Drug Fair wall.

During this time, one of the group suggested that "somebody should do that to a synagogue." Apparently heeding this suggestion, defendants proceeded toward the nearby grounds of Shaare Tefila Congregation. On their way, they painted a swastika on the car of synagogue member Jacob Teller, parked outside the synagogue. Defendants then entered the grounds of the synagogue and painted offensive symbols and slogans on the building similar to those painted at the Drug Fair. These included swastikas, a skull and crossbones, a burning cross, and the slogans "Dead Jew," "Death to the Jude," "Ku Klux Klan," and on·a doorway the words "In, Take a Shower Jew." Also found on the building was the phrase "Toten Kamf Raban," apparently a reference to the Totenkopfverbände— "death head units" of Nazi concentration camp guards from 1936 through World War II. The skull and crossbones was the insignia of the Totenkopfverbände. As one would expect, these actions caused members of the congregation great emotional distress and fear.

The complaint alleges that the racial character of defendants' actions is established by their perception "of plaintiffs as racially distinct because they are Jews," and the procedural posture of this case requires us to assume that defendants do indeed view Jews as racially distinct. This assumption is further supported by the nature of the slogans and symbols painted on the synagogue and by the statements of defendants themselves. The paintings found on the synagogue align the defendants with both the Ku Klux Klan and the Nazis, two groups infamous for their persistence in the view that Jews constitute a separate and inferior race. *See infra,* at 530–531. Depositions of defendants reveal that they understood the message of these groups and ascribed to the validity of their racial theories. Defendant Heine, for example, understood that the Nazis wanted to develop a superior race, one distinct from the Jewish race. Defendant Hunt believed that the phrase "Dead Jew" would make a Jew uncomfortable because "[i]t's an insult to your race." Thus, there is no question on appeal that defendants considered Jews to be a racially distinct group.

## II.

Without so much as a hint as to the affirmative reach of § 1982, the majority asserts *ipse dixit* that defendants' actions "are not what section 1982 was intended to protect against." *Ante* at 527. This conclusion cannot withstand analysis. Federal civil rights laws protect citizens from acts of discriminatory intent. The discrimination found here is no different in character or consequence from that found in every racial discrimination case. Misperception lies at the heart of prejudice, and the animus formed of such ignorance sows malice and hatred wherever it operates without restriction. By removing the restriction of federal laws, the majority allows racial motivations greater latitude to effect their intolerable aims. There is simply no good reason why we should interpret this statute to protect against some forms of racial animus but not others.

There is, of course, no question that the Civil Rights Act of 1866, the genesis of §§ 1981 and 1982, was aimed at the evil fostered by racially discriminatory animus. Though not intended to provide recovery for discrimination based on religion, *Runyon v. McCrary,* 427 U.S. 160, 167, 96 S.Ct. 2586, 2592, 49 L.Ed.2d 415 (1976); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968), or national origin, *Jones,* 392 U.S. at 413, 88

S.Ct. at 2189,[2] these sections clearly prohibit *"all* racially motivated deprivations of the rights enumerated in the statute." *Id.* at 426, 88 S.Ct. at 2195 (emphasis in original). The focus on discriminatory intent is not unique to §§ 1981 and 1982, for the presence of such intent is sufficient to establish violations of other laws aimed at the eradication of racial prejudice. *See, e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977) (Title VII); *Washington v. Davis,* 426 U.S. 229, 238–42, 96 S.Ct. 2040, 2046–48, 48 L.Ed.2d 597 (1976) (Fifth, Fourteenth Amendments); *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) (42 U.S.C. § 1985(3)). The effort to eliminate racially motivated actions, moreover, is not to be obstructed by narrow interpretations. The laws at issue here offer protection to "all persons" (§ 1981) and "all citizens" (§ 1982), and "establish[ed] in the federal law a broader principle than would have been necessary simply to meet the particular and immediate plight of the newly freed Negro slaves." *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 296, 96 S.Ct. 2574, 2586, 49 L.Ed.2d 493 (1976) (holding § 1981 available to whites). Put simply, the laws established the right of every person to be free of enumerated deprivations motivated by racial animus.

The focus on the subjective intent of the actor reflects the reality that discrimination and prejudice is grounded in erroneous perceptions. In the more familiar case, racial discrimination is based on the misperception of the relevance of racial identity. Bigots are motivated by the belief that those of another race are inferior and hence worthy of physical, mental and social repression. *See,* G. Myrdal, *An American Dilemma* 97–106 (1944). Broad, stereotypical assumptions about race have always formed the basis for both private and official acts of prejudice. One would think it

preposterous to require that these beliefs be objectively true before federal law provides protection. To the contrary, it is precisely because such beliefs are false and reprehensible that federal civil rights laws were enacted. These laws provide redress for the harms suffered by misperceptions about the relevance of race as a basis for action in our society.

Plaintiffs here were confronted not only with these misperceptions about the relevance of racial identity but also with the misperception that Jews are a distinct and inferior race. The evil visited upon them was thus a dual one. It is, of course, clear to this court, the district court, and counsel that Jews are not, under any legitimate view, a distinct race, but are in fact members of a religious community with a rich cultural heritage. *See* A. Montagu, *Man's Most Dangerous Myth: The Fallacy of Race* 353–77 (5th ed. 1974). Yet the majority finds that the misperceptions at work here deprive the claim of the "racial character," *Georgia v. Rachel,* 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966), necessary to bring it within § 1982. This conclusion must rest upon the view that the racial fallacies here are so different from those routinely prohibited by federal law as to fall outside the scope of it. I fail to see any relevant distinction between the racial attitudes that prompted defendants' actions and those at work in actions clearly within the scope of § 1982.

It is undeniable that the misguided view of the racial distinctiveness of Jews has led to atrocities of no less consequence than those generated by other fallacious beliefs about race. Though history is unfortunately replete with examples of repression of Jews as a people, one need not trace these problems through the ages to discern the consequences of distorted racial views about Jews, for it is during this century that their most terrible effects have been witnessed. Hitler was driven by the belief

---

2. The Supreme Court has interpreted § 1981 to prohibit discrimination due to alienage, *Takahashi v. Fish and Game Commission,* 334 U.S. 410, 419–20, 68 S.Ct. 1138, 1142–43, 92 L.Ed. 1478 (1948), but the extent of this protection is unclear. *See* Note, *National Origin Discrimination Under Section 1981,* 51 Fordham L.Rev. 919, 922–23 & note 28 (1983).

that Jews constituted a separate race that threatened his goal of racial purity. *See,* G. Gilbert, *Nuremberg Diary* 43 (1947) (testimony of Julius Streicher). "The fact that the Nazi 'race' theories represented the most ludicrous and vicious mythology that had ever been perpetuated upon a people did not ... prevent those myths from functioning as if they were perfectly true." A. Montagu, *Man's Most Dangerous Myth,* at 49. History teaches, then, that misperceptions about racial identity are no different in the misery and hatred they spread than misperceptions about the relevance of race.[3]

Nor is the danger of warped racial classification of Jews simply a matter of history. Neo-Nazi groups in the United States make no effort to hide their racist heritage or their ultimate goals. The National Socialist Party of America, for example, has proclaimed among its fundamental principles "acceptance of Adolf Hitler" and "the Jew as the Ultimate Enemy." *The New Order,* March 1979, at 3. These principles are expressed in explicitly racist terms: "The single serious enemy facing the White man is the Jew. The Jews are not a religion, they are an asiatic *race,* locked in mortal conflict with Aryan man which has lasted for millenia, and which will continue until one of the two combat peoples are extinct." *Id.* (emphasis in original). A group called Aryan Nations, in a publication of the same name, has implored its readers: "Aryans Awake! Jews are the Race of Satan!" *Aryan Nations,* No. 30 (1979) at 8. The racist view of Jews is also a major tenet of the Ku Klux Klan. An expert on the Klan, in an affidavit prepared for this litigation, noted that "a prevalent belief among the various Ku Klux Klan groups is that Jewish people are racially distinct from whites."

These views, like those of the Nazis, have resulted in numerous instances of violence against Jewish citizens. The facts of this case, unfortunately, are not isolated but instead representative of such incidents. In 1985 alone there were, in the estimate of one organization, 638 incidents of anti-Semitic vandalism against Jewish institutions, private Jewish homes, and Jewish businesses in the United States. Anti-Defamation League of B'nai B'rith, *1985 Annual Audit of Anti-Semitic Incidents* 1 (1986). Anti-Semitic physical assaults against Jews, and anti-Semitic threats and harrassment of Jewish institutions reportedly totaled 306. *Id.* at 2. Even were such events less prevalent, it would not lessen the sufferings of those subjected to them.

Of course, not every wrong against a Jewish citizen would be actionable under the civil rights laws. Here, however, we deal with the adherents of organizations whose aims are avowedly racial. It is clear that this case, like every case of racial discrimination, is the result of racial misperceptions. These misperceptions, moreover, result from the same catalyst for fear and violence that caused Congress to enact the Civil Rights Acts of 1866 and 1871. Defendants appropriate the very symbols of the Ku Klux Klan, the organization that visited the most virulent brand of racial violence in the Reconstruction era. In acting against it, Congress proclaimed the right of "all persons" to be free of "all racially motivated deprivations of the rights enumerated in the statute." *Jones,* 392 U.S. at 426, 88 S.Ct. at 2196. The majority now denies that right to plaintiffs by allowing defendants' misperceptions and ignorance to serve as a defense to their actions.

**3.** There can be no question that the Nazi theory and practice was racial. "[T]he Nazi attitude and discrimination against the Jews was not founded upon their religious practices; it did not cease upon religious conversion. Indeed, it even manifested itself in hunting down and 'rejudaizing' assimilated Christians of Jewish extraction. Nor was this discrimination based upon national origin, since Jews of impeccable German ancestry were equally subject to the atrocities visited upon French, Polish, Danish, and Russian Jews. The Nazi discrimination against Jews was racial in that the Nazis defined the Jews as separate from their 'Aryan' race and maintained that Jews were a physically distinct people." Greenfield & Kates *Mexican Americans, Racial Discrimination, and the Civil Rights Act of 1866,* 63 Cal.L.Rev. 662, 677–78 (1975).

### III.

The failure to allow this claim under § 1982 is not only inconsistent with the purpose of the statutory scheme, but also saddles the courts with the difficult and inappropriate burden of delineating racial distinctions in a context where they are irrelevant and unnecessary. The majority, apparently fearful that § 1982 actions might rest "entirely on the idiosyncracies of individual defendants," *ante* at 525, rejects the racial nature of the actions here because the victims did not actually belong to the distinct racial class in which defendants placed them. This approach, I presume, requires courts to determine by some more objective criteria whether an individual is a member of a distinct race before the Civil Rights Act of 1866 may apply. Yet the majority offers little guidance about how courts should undertake the troubling task it requires. Careful consideration of the burden imposed by the majority reveals significant deficiencies in the approach it establishes.

It is unrealistic to expect that a biological or anthropological perspective on the question of race will help courts to determine those protected under the majority's approach. The scientific concept of "race" is anything but definite. As one court has noted, scientists generally agree that "[t]he notion of race is a taxonomic device [that] exists in the human mind and not as a division in the objective universe." *Ortiz v. Bank of America*, 547 F.Supp. 550, 565 (E.D.Cal.1982). *See* M. Banton & J. Harwood, *The Race Concept* 43–60 (1975); F. Livingstone, *On the Nonexistence of Human Races* in *The Concept of Race* (A. Montagu, ed. 1964). Scientists engaged in racial classification recognize that the choice of characteristics used to determine racial groups is arbitrary and depends upon the reason for classification rather than objective reality. *See, Ortiz*, 547 F.Supp. at 565–66 and sources cited; Lundsgaarde, *Racial and Ethnic Classifications: An Appraisal of the Role of Anthropology in the Lawmaking Process*, 10 Hous.L.Rev. 641, 648–49 and note 23 (1973). Moreover, racial classifications are dynamic and subject to constant re-examination. *See* A. Montagu, *Statement on Race* 46–50 (3d ed. 1972). In short, the inexact and unstable nature of scientific racial classification makes the tool all too treacherous for a court seeking to determine the precise coverage of federal law.

More significantly, the scientific debate over the meaning of race is simply irrelevant to the determination of the protection of a statute addressed to a social phenomenon. As this case demonstrates, it is not scientifically authenticated views but rather distorted social perceptions that lie at the root of racial violence. "The social definition and not the biological facts actually determines the status of an individual and his place in interracial relations.... [T]he scientific concept of race is *totally inapplicable at the very spots where we recognize 'race problems.'*" G. Myrdal, *supra*, at 115. (emphasis in original). We cannot be blind to the fact that "[t]o most people, a race is any group of people whom they choose to describe as a race." UNESCO, *Statement on Race* (1950) in A. Montagu, *Statement on Race* at 8. In construing statutes designed to eliminate racial prejudice, we must confront the reality that the perceptions of individuals, rather than the measurements of science, define the scope of racial discrimination. To limit § 1982 to discrimination against scientifically established racial groups would deprive the remedy of its force in an artificial and disingenuous manner.

Perhaps in recognition of the inadequacies of a scientific approach to the scope of § 1982, several courts have employed a "common perception" test to determine the coverage of the statute. *See, e.g., Ramos v. Flagship International, Inc.*, 612 F.Supp. 148, 151 (E.D.N.Y.1985); *Banker v. Time Chemical, Inc.*, 579 F.Supp. 1183, 1186 (N.D.Ill.1983); *Budinsky v. Corning Glass Works*, 425 F.Supp. 786, 788 (W.D. Pa.1977). The majority implies that § 1982 might apply here if the misperception at work were a common or widely-shared view, but rejects the application of this test

because "the position of Jews in this society [is not] analogous to that of Mexican-Americans or others commonly considered to be non-white." *Ante* at 527. Thus, while recognizing the role of misperceptions in racial discrimination, the majority apparently requires that they be broadly held for § 1982 to apply. There are several reasons why any such approach must be rejected on these facts.

First, the majority's assertion of the common perception of Jews is totally unsupported. The level and persistence of racial violence against Jews, as discussed above, certainly suggests that the misperceptions here are shared by too sizeable a number of individuals. One anthropologist has observed that "Jews are nearly always referred to in popular parlance as a 'race.' This is done not only by the so-called 'man in the street' but also by many scientists, medical men, philosophers, politicians, historians, and the members of many other professions." A. Montagu, *Man's Most Dangerous Myth*, at 353 (footnote omitted). Thus, there exists a real question about the breadth of the views at work in this case. If the majority insists that misperceptions be broad based for § 1982 to apply, plaintiffs should at least be given the opportunity to show the scope of the belief that they are members of a distinct race.

In any event, the scope and breadth of illegitimate views is not controlling where, as here, plaintiffs seek to demonstrate that these particular defendants held, and were motivated by, racial misperceptions. The very purpose of the Civil Rights Acts was to ensure that the most bigoted people are not permitted to translate their impulses into tangible harms. Protection against the acts of racial prejudice is necessary whether the views are widely held or idiosyncratic. Where, as here, plaintiffs are prepared to show defendants were motivated by racial beliefs, however misguided, there is no reason for a court to require more. Many courts have recognized that proof of racial motivation, without more, is sufficient to bring an action within § 1981 or § 1982. *See, e.g., Khawaja v. Wyatt*, 494 F.Supp. 302, 304 (W.D.N.Y.1980); *Apodaca v. General Electric Co.*, 445 F.Supp. 821, 823–24 (D.N.M.1978). The fact that courts may sometimes find it convenient to look to common perceptions to determine racial status should not preclude plaintiffs from showing that defendants here operated on the basis of racial misperceptions, however misguided or idiosyncratic.

Permitting the subjective belief of defendants to give a claim the "racial character" necessary to bring it within the civil rights statutes thus not only ensures adequate coverage but also avoids in many cases the difficult and troubling task of drawing racial lines. Even if courts were well equipped to make racial determinations without engaging in "precisely the kind of stereotyping which the civil rights statutes were designed to prevent," *Khawaja*, 494 F.Supp. at 305 n. 1, the undertaking presents a potential for continued harm and prejudice so great that it should be avoided wherever possible. It is an understatement to note that attempts to place individuals in distinct racial groups frequently serve only to facilitate continued discrimination and postpone the day when all individuals will be addressed as such. It is regrettable that the majority has adopted an approach that demands judicial draftsmanship of an officially recognized and protected list of races.[4] It is doubly regrettable that it adopts this approach in a case where the racial nature of the acts is clear and compelling.

---

**4.** It is only the majority's approach that establishes a need for racial distinctions here. In *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295, 96 S.Ct. 2574, 2585, 49 L.Ed.2d 493 (1976), the Supreme Court examined the legislative history of the Civil Rights Act of 1866 and rejected the view that the act applied only to nonwhites. There is thus no need to draw racial lines to determine those who are potential beneficiaries of the protection offered by § 1982. This task is imposed only by the majority's requirement that plaintiffs demonstrate the reality of the racial class in which defendants place them.

**534**

### IV.

Finally, it simply will not do to say that plaintiffs are limited to some unidentified state law remedy. The assertion that this controversy "belong[s] in the state courts," *ante* at 528, begs the question of whether federal law contemplates protection here. Moreover, exclusive reliance on state remedies is particularly inapposite in the context of civil rights, a persistent concern of federal legislation. In enacting the Civil Rights Act of 1866, Congress intended at the very least to supplement state laws. *See Jones,* 392 U.S. at 426–36, 88 S.Ct. at 2196–2201. The Civil Rights Act of 1871, also known as the Ku Klux Klan Act, was designed precisely to provide a federal remedy for activities such as those found in this case. *See, Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). To now relegate these matters exclusively to state law simply disregards the nature and scope of federal remedies provided by Congress and the unique capacity of federal law to voice a strong and uniform commitment to the eradication of discrimination in our midst.

### V.

I would thus reverse the judgment of the district court and find plaintiffs' complaint sufficient to state a cause of action under §§ 1982 and 1985(3). Section 1982 guarantees "all citizens of the United States" an equal right "to hold ... real and personal property." Section 1985(3) protects them against racially motivated conspiracies to deprive them of the equal protection of federal laws. As the property, indeed the place of worship, of this community was desecrated for reasons and with symbols that resorted unabashedly to race, I would hold the congregation of Shaare Tefila Synagogue entitled to the protection of our civil rights laws. To do otherwise is to blind ourselves as a nation to the real nature of race prejudice, and to leave American citizens open to the depredations of racial violence—the very acts against which Congress more than a century ago had sought to protect them.