**Harold W. HANSBOROUGH,
Jr., Plaintiff,**

v.

**CITY OF ELKHART PARKS AND
RECREATION DEPARTMENT,
Defendant.**

**No. S91–13.**

United States District Court,
N.D. Indiana,
South Bend Division.

Sept. 30, 1992.

Bryon J. Berry, Warsaw, Ind., for plaintiff.

Richard C. Noser, Rebecca F. Butler, Elkhart, Ind., for defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ALLEN SHARP, Chief Judge.

## I. PROCEDURAL HISTORY

Plaintiff Harold W. Hansborough, Jr. initially filed charges with the Equal Employment Opportunity Commission ("EEOC") after being terminated from his position with the defendant, City of Elkhart Parks and Recreation Department ("City of Elkhart") on July 5, 1990. A "right to sue" letter was issued by the EEOC to Mr. Hansborough on December 3, 1990.[1] The plaintiff filed suit in this court on January 9, 1991 pursuant to Title VII of the Civil Rights Act of 1964 for employment discrimination. 42 U.S.C. §§ 2000e—2000e–17. The court granted the plaintiff's petition to proceed *in forma pauperis* on January 9, 1991. On January 24, 1991 the plaintiff moved the court to appoint legal counsel to represent him. The court held a pre-trial conference on this matter on May 10, 1991 at which time the plaintiff appeared *pro se*, and the court agreed to attempt to appoint counsel for the plaintiff. On June 27, 1991, Bryon Berry entered his appearance on behalf of the plaintiff. On September 17, 1991 the court held a telephonic pre-trial conference in this matter, and a schedule for proceeding with this case was established.

On October 30, 1991 the plaintiff filed an amended complaint. The defendant filed a motion for summary judgment on August 13, 1992. As of this date, no response has been filed by the plaintiff. Nonetheless, this court now proceeds with its ruling on the motion pursuant to Fed.R.Civ.P. Rules 12(c) and 56 and Local Rule 9.

## II. ISSUES PRESENTED

The plaintiff alleges that he has been discriminated against in violation of Title VII by his supervisors at the City of Elkhart's Mayor's Summer Youth Corp Program. The Recreation Supervisor for the Parks and Recreation Department and the supervisor of the Mayor's Summer Youth Corp Program, Ben Barnes, is a black male. The plaintiff's immediate supervisor, Virta Vance, is a black female. Mr. Hansborough is alleging both race and sex discrimination. Thus, the first issue this court must address is whether intraracial

---

1. The EEOC dismissed Hansborough's charges and issued the notice of right to sue, because Hansborough "failed to provide requested necessary information, failed or refused to appear or be available for necessary interviews/conferences or otherwise refused to cooperate to the extent that the Commission has been unable to resolve your charge." Notice of Right to Sue, EEOC Form 161.

discrimination is actionable under Title VII. The exact issue before this court is whether discrimination by a black individual against another black individual because of the fact that he is a black person is actionable under the Civil Rights Act of 1964 ("1964 Act")[2].

For the reasons expressed below, this court holds that intraracial discrimination is actionable under Title VII. Given this finding, the court then addresses a second issue: whether Hansborough has sustained his burden of proof to establish his prima facie case of discrimination under Title VII.

## III. SUMMARY JUDGMENT

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; accord *Juarez v. Ameritech Mobile Communications*, 957 F.2d 317, 320 (7th Cir.1992). A material question of fact is a question which will be outcome determinative of an issue in that case. *Wainwright Bank v. Railroadmens Federal Sav.*, 806 F.2d 146 (7th Cir.1986).

While generally, "Summary Judgment is only appropriate when the record reveals that no reasonable jury could find for the nonmoving party, ... this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue." *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 370–371 (7th Cir.1992) (citations omitted). Still, "[s]ummary judgment will not be defeated simply because issues of motive or intent are involved, and is proper when the plaintiff fails to indicate any motive or intent to support plaintiff's position." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1109 (7th Cir.1992) (quoting *Morgan v. Harris Trust & Savings Bank*, 867 F.2d 1023, 1026 (7th Cir.1989)). The most recent, thorough discussions of Rule 56 by the Supreme Court of the United States can be found in a trilogy of cases decided in 1986. See *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)[3]; and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

After *Celotex*, it is clear that a nonmoving party may not rest on its pleadings to avoid summary judgment. *Celotex*, 477 U.S. at 325–26, 106 S.Ct. at 2554. See also, *Lujan v. National Wildlife Federation*, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (7th Cir.1990); and *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145 (7th Cir.1989). "The days are gone, if they ever existed, when the nonmoving party could sit back and simply poke holes in the moving party's summary judgment motion." *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). The initial

---

**2.** As stated in the Amended Complaint all discriminatory actions alleged in this suit occurred on or before July 5, 1990, the date of the plaintiff's termination. Therefore, the Civil Rights Act of 1991 ("1991 Act") is not applicable. The retroactivity of that statute is well decided in this circuit. In a line of cases, the Seventh Circuit has stated that it is not retroactive and, therefore, does not enter into the discussion of the issues in this case. See:

1. *Mozee v. American Commercial Marine Service Co.*, 963 F.2d 929 (7th Cir.1992).
2. *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225 (7th Cir.1992).
3. *Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir.1992).

4. *Taylor v. Western and Southern Life Insurance Co.*, 966 F.2d 1188 (7th Cir.1992).
5. *Banas v. American Airlines*, 969 F.2d 477 (7th Cir.1992)

Furthermore, this court notes that not only the Seventh Circuit but all circuits that have ruled on the question of retroactivity have denied that substantive changes made by the 1991 Act apply retroactively. *Vogel v. Cincinnati*, 959 F.2d 594 (6th Cir.1992); *Fray v. Omaha World Herald Co.*, 960 F.2d 1370 (8th Cir.1992); *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363 (5th Cir.1992).

**3.** For the judicial epilogue of *Celotex*, see *Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33 (D.C.Cir.1987), cert. denied, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

burden is on the moving party to demonstrate "with or without supporting affidavits" the absence of a genuine issue of material fact and that judgment, as a matter of law, should be granted in the moving party's favor. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Rule 56). Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.' " *Id.* Furthermore, in *Anderson,* the Court held that what facts are material in a specific case shall be determined by the substantive law controlling that case or issue. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In addition, the Court went on to interpret Rule 56 as requiring that courts analyze summary judgment motions utilizing the standard of proof relevant to the specific case or issue. *Id.* at 252–55, 106 S.Ct. at 2512–14.

For academic insight into *Celotex* and *Anderson,* see Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 194 (1987), where the author states:

> The recent Supreme Court cases likely require that summary judgment be more readily granted.... This emerging trend signals a new era for summary judgment, one in which the old presumptions are giving way to a policy of balancing and efficiency, and the mechanism is more appropriate to double as a sufficiency motion—allowing some sort of trial itself on the paper record.

More recently Childress has written that *Celotex* and *Anderson* clarify that Rule 56 motions

> should not be hesitantly granted when appropriate.... Any litigant dealing with summary judgment must be aware of this new trend, the Court's cases, their application in each circuit, and the direction they portend. Pretrial practice is a new ballgame.

Childress, *A Standards of Review Primer: Federal Civil Appeals,* 125 F.R.D. 319, 343 (1989).

Recent object lessons applying these ideas are found in *Kizer v. Children's*

*Learning Ctr.,* 962 F.2d 608 (7th Cir.1992); *Karazanos v. Navistar Intern. Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991); *Old Republic Ins. Co. v. Federal Crop Ins. Corp.,* 947 F.2d 269, 273–274 (7th Cir.1991); and *Un. Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1265 (7th Cir.1990).

## IV. INTRARACIAL DISCRIMINATION

■ Before addressing the merits of this case, an important underlying question must be addressed. Specifically, the issue to be considered is whether intraracial discrimination is actionable under Title VII. Or, in this precise case, whether discrimination by one black person against another black person because of the fact that he is a black person is actionable under the 1964 Act.

Certainly, the first place that one must look to answer this question is to the face of the statute itself. If the answer is not readily apparent from such an examination, it may also be relevant to look to the legislative history of the enactment. Still another source to consider is the judicial interpretation of that statute by the Supreme Court of the United States and the lower federal courts.

The section of the statute pertinent to this case provides as follows:

> (a) It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2(a)(1). An examination of the statute reveals that it is essentially neutral on the question of intraracial discrimination.

Certainly it is not impossible for one black person to discriminate against another black person *on the basis of race or color.* However, when one examines the legislative history of this statute, it is most difficult to discern any specific contempla-

tion of intraracial discrimination. One can state as a historical fact that that specie of discrimination was not even a minor consideration in the eyes of the sponsors of the legislation in 1964. When one reads the congressional debates and, particularly, the statements of the leading sponsors of the legislation in the United States Senate, namely Hubert Humphrey & Everett McKinley Dirksen, one is hard pressed to find the kind of discrimination that is alleged in this case. Beyond any doubt these two Senators were the leading sponsors of that legislation. Indeed, President Lyndon Johnson later said that the 1964 Act should properly be called the Humphrey–Dirksen Act. Thus, the legislative history does not provide any definitive answer or guidance with reference to the question of intraracial discrimination.

The research of this court has not revealed many cases, particularly at the Court of Appeals level and above, that have thoroughly addressed this precise issue with respect to this exact statute, 42 U.S.C. §§ 2000e—2000e–17. However, there a number of cases sufficiently similar to give this court substantial guidance. Most of the relevant decisions address the issue in regards to 42 U.S.C. §§ 1981 and 1982.[4] Nevertheless, these cases are instructive, because

"[t]he historical predecessor to Title VII is the Civil Rights Act of 1866 and therefore 42 U.S.C. § 1981. In fact, in a suit such as this one, the legal elements and facts necessary to support a claim for relief under Title VII are identical to the facts which support a claim under § 1981. *Lincoln v. Board of Regents*, 697 F.2d 928 (11th Cir.1983); *Caldwell v.*

*Martin Marietta Corporation*, 632 F.2d 1184, 1186 (5th Cir.1980)."

*Walker v. Sec. of Treasury, I.R.S.*, 713 F.Supp. 403, 405 (N.D.Ga.1989). The Seventh Circuit has repeatedly stated "that the same standards that govern Title VII liability also govern section 1981 liability." *Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1307 (7th Cir.1985); *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 568 (7th Cir.1989).

The § 1981 cases discussed below arose largely because that statute did not specifically forbid discrimination based upon national origin. While 42 U.S.C. § 2000e–2 does not suffer that same exclusion, the ultimate discussions in the § 1981 cases are useful as the decisions necessarily entail recognizing the problems of grouping persons by race and the inherent problems that arise with such attempts to define and group human beings.[5] Thus, this court's analysis will begin with a survey of the Supreme Court and lower federal courts' writings on this question. Interestingly, these cases have often involved a situation of one Caucasian discriminating against another Caucasian. Obviously, the points made in such decisions provide significant assistance to this court in dealing with the issue currently before it.

When the Supreme Court described the 1866 Act as designed only to redress "racial discrimination," the lower courts divided on their interpretations of what the Supreme Court meant. Linda A. Lacewell and Paul A. Shelowitz, *Beyond a Black and White Reading of Sections 1981 and 1982: Shifting the Focus from Racial Status to Racist Acts*, 41 U.Miami L.Rev. 823, 824 n. 11 (1987) (citing *McDonald v. Santa*

---

**4.** 42 U.S.C. § 1981 provides in pertinent part:
   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
   42 U.S.C. § 1982 provides in pertinent part:
   All citizens of the United States shall have the same right, in every State and Territory, as is

enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

**5.** "Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis College*, 481 U.S. 604, 609, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 (1987) (citing *Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976).

*Fe Trail Transp. Co.,* 427 U.S. 273, 287, 96 S.Ct. 2574, 2582, 49 L.Ed.2d 493 (1976); *Johnson v. Railway Express Agency,* 421 U.S. 454, 459–60, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968)). The lower courts were faced with the problem of defining "race." The courts arrived at different definitions as well as different "conclusions as to the scope of the statutes [42 U.S.C. §§ 1981 and 1982]." Lacewell and Shelowitz, *supra,* 41 U.Miami L.Rev. at 836. In 1987 the Supreme Court was faced with resolving the conflict between the lower courts regarding the scope of the statutes. In that year two cases came before the court: (1) *Shaare Tefila Congregation v. Cobb,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987), *rev'g* 785 F.2d 523 (4th Cir.1986); and (2) *Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), *aff'g* 784 F.2d 505 (3rd Cir.1986).

In *Shaare Tefila,* the Court of Appeals for the Fourth Circuit had held that § 1982 was not "intended to apply to situations in which a plaintiff is not a member of a racially distinct group but is merely *perceived* to be so by defendants." *Shaare Tefila Congregation v. Cobb,* 785 F.2d 523, 526 (4th Cir.1986), *rev'd,* 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987). In *Shaare Tefila,* the plaintiffs sought to support their argument by relying upon the Tenth Circuit's decision in *Manzanares v. Safeway Stores, Inc.,* 593 F.2d 968 (10th Cir.1979).[6] However, the Fourth Circuit found *Manzanares* unpersuasive. Writing for the Fourth Circuit, Judge Hall explained:

> *Manzanares* did not hold that a defendant's mere perception of a plaintiff as racially distinct is sufficient to constitute racial discrimination in violation of sec-

tion 1981. Instead, the Tenth Circuit emphasized that Mexican–Americans, as a group, are commonly treated differently from Anglo–Americans, as a group. We do not find the position of Jews in this society to be analogous to that of Mexican–Americans or others commonly considered to be non-whites.

*Shaare Tefila,* 785 F.2d at 526–527. The Fourth Circuit feared that to allow a

> claim of racial discrimination solely on the basis of defendant's perception of Jews as being members of a racially distinct group.... would permit charges of racial discrimination to arise out of nothing more than the subjective, irrational perceptions of defendants.

*Id.* at 527. Thus, the Fourth Circuit concluded, as a matter of law, that Jews were not a "racially distinct group," and, therefore, the Shaare Tefila Congregation had no claim under § 1982. *Id.*

At the same time the Fourth Circuit was involved with deciding *Shaare Tefila,* the Third Circuit was faced with the same basic issue in *Al–Khazraji v. Saint Francis College,* 784 F.2d 505 (3rd Cir.1986), *aff'd,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987).[7] Al–Khazraji brought this suit alleging in part that the defendant had violated § 1981 by denying him tenure on account of his race and/or national origin. The Third Circuit declined to reach the issue of the applicability of § 1981 to national origin discrimination. *Al–Khazraji,* 784 F.2d at 514 n. 11. Instead, it framed the issue as one of racial discrimination. With respect to race and the § 1981 claim, the defendants argued that the plaintiff could not sue under § 1981, "because Arabs are not a 'protected minority.'" *Id.* at 514. Furthermore, the defendants argued "that an ethnic Arab is taxonomically a Caucasian and therefore 'not a protected

---

**6.** The *Manzanares* case was a 42 U.S.C. § 1981 suit brought by a plaintiff of Mexican–American descent against his employer and the labor union. The plaintiff, Manzanares, alleged that he was treated differently than Anglo–Americans suffering discrimination due to his race and/or national origin. The Tenth Circuit held that "section 1981 is directed to racial discrimination primarily, but is not necessarily limited to the

technical or restrictive meaning of 'race'." *Manzanares,* 593 F.2d at 971. Thus, Manzanares was found to have a claim actionable under section 1981.

**7.** *Al–Khazraji* was decided by the Third Circuit on March 3, 1986. *Shaare Tefila* was decided by the Fourth Circuit on March 7, 1986.

person under Section 1981 when he is presumably claiming other Caucasians or whites were improperly favored over him.'" *Id.* The Third Circuit did not find the defendants' position persuasive and held that "ethnic Arabs may depend upon Section 1981 to remedy racial discrimination against them." *Id.* Writing for the court, Judge Stapleton, concluded that "Al-Khazraji should be allowed the opportunity to prove that the discrimination he alleges is racially motivated within the meaning of Section 1981." *Id.* at 518. Thus, the *Al-Khazraji* court found the issue to be essentially one of fact rather than a matter of law as it was perceived by the Fourth Circuit in *Shaare Tefila*.[8]

The Supreme Court of the United States granted certiorari in both *Shaare Tefila* and *Al-Khazraji* and decided both on the same date, May 18, 1987. The Supreme Court did not accept the Fourth Circuit's conclusions; it reversed and remanded *Shaare Tefila*. *Shaare Tefila*, 481 U.S. at 618, 107 S.Ct. at 2022. The Supreme Court held·that

> a charge of racial discrimination within the meaning of § 1982 cannot be made out by alleging only that the defendants were motivated by racial animus; it is necessary as well to allege that defendants' animus was directed towards the kind of group that Congress intended to protect when it passed the statute.

*Shaare Tefila*, 481 U.S. at 617, 107 S.Ct. at 2021. The Supreme Court explained that both Jews and Arabs were groups intended to be protected by the statute and concluded that "Jews are not foreclosed from stating a cause of action against other members of what today is considered to be part of the Caucasian race." *Id.* at 618, 107 S.Ct. at 2022.

In *Saint Francis College*, the Supreme Court stated unequivocally that one Caucasian could maintain a § 1981 suit against another. *Saint Francis College*, 481 U.S. at 609–610, 107 S.Ct. at 2026. Writing for a unanimous court, Justice White explained

that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Id.* at 613, 107 S.Ct. at 2028. In concluding the decision, Justice White wrote:

> The Court of Appeals was ... quite right in holding that § 1981, 'at a minimum,' reaches discrimination against an individual 'because he or she is· genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens.*' *It is clear from our holding, however, that a distinctive ·physiognomy is not essential to qualify for § 1981 protection.*

*Id.* (emphasis added). The Supreme Court came to its conclusion partly because of the misunderstandings and arbitrariness inherent in racial classifications. Specifically, the Court noted:

> There is a common popular understanding that there are three major human races—Caucasoid, Mongoloid, and Negroid. Many modern biologists and anthropologists, however, criticize racial classifications as arbitrary and of little use in understanding the variability of human beings. It is said that genetically homogeneous populations do not exist and traits are not discontinuous between populations; therefore, a population can only be described in terms of relative frequencies of various traits. Clear-cut categories do not exist. The particular traits which have generally been chosen to characterize races have been criticized as having little biological significance. *It has been found that differences between individuals of the same race are often greater than the differences between the 'average' individuals of different races.* These observations and others have led some, but not all, scientists to conclude that racial classifications are for the most part sociopolitical, rather than biological in nature.

---

8. Lacewell and Shelowitz discuss this dichotomy in depth in their law review article. *See,* Lacewell and Shelowitz, *supra,* at 837–841. · Lacewell and Shelowitz provide a list of cases in note 102 of their article which follow the same logic as the Fourth Circuit's *Shaare Tefila* decision.

*Id.* at 610 n. 4, 107 S.Ct. at 2026 (emphasis added).

Certainly, this Supreme Court decision has made clear that discrimination claims should not be barred merely because the plaintiff(s) and defendant(s) belong to the same race. Other district courts have reached this precise conclusion. In *Walker*, Senior District Judge Moye was faced with deciding whether "a light-skinned black person [has] a cause of action pursuant to Title VII against a dark-skinned black person for an alleged discriminatory termination of employment?" *Walker*, 713 F.Supp. at 405. The *Walker* court relied heavily upon the Supreme Court's *Saint Francis* decision. *Walker* noted particularly that the Supreme Court had considered the legislative history of § 1981 and concluded that

> "Congress intended § 1981 to apply to all forms of discrimination including acts of discrimination against groups including Finns, gypsies, Basques, Hebrews, Swedes, Norwegians, Germans, Greeks, Finns, Italians, Spanish, Mongolians, Russians, Hungarians, Chinese, Irish and French."

*Walker*, 713 F.Supp. at 407. The *Walker* court noted that

> [i]t would take an ethnocentric and naive world view to suggest that we can divide caucasians into many sub-groups but some how all blacks are part of the same sub-group. There are sharp and distinctive contrasts amongst native black African peoples (sub-Saharan) both in color and in physical characteristics....
>
> ... the Supreme Court has said that 'a distinctive physiognomy is not essential to qualify for § 1981 protection. *It therefore is not controlling that in the instant case a black person is suing a black person.*"

*Id.* at 407–408 (citations omitted) (emphasis added). Thus, the *Walker* court concluded that a light-skinned black person may indeed have a cause of action pursuant to Title VII against a dark-skinned black person for an alleged discriminatory termination of employment.

Just this year the District Court of Puerto Rico has faced the question of whether discrimination by one Puerto Rican person against another Puerto Rican person is actionable under the Civil Rights Acts. *Franceschi v. Hyatt Corp.*, 782 F.Supp. 712 (D.Puerto Rico 1992). In *Franceschi* the defendants contended that intraracial discrimination was not actionable under § 1981. The *Franceschi* court disagreed. Relying heavily upon *Saint Francis* and quoting the *Walker* court's holding that "intra-racial color discrimination claims are authorized by both title VII and existing Supreme Court precedent," the *Franceschi* court found that discrimination by one Puerto Rican against another Puerto Rican is actionable. *Franceschi*, 782 F.Supp. at 723. Judge Perez–Gimenez noted the fear that some courts have expressed over the "potential task of distinguishing among a myriad of color shades, physiognomic and cultural characteristics." *Id.* But as he explained, "*Saint Francis* effectively lays to rest this quandary by eliminating color as a determinative factor." *Id.* The import of the *Saint Francis* decision is

> the recognition that physiognomic characteristics are no longer considered the indispensable magic recipient for a cause of action under the statute. Rather, it is the subjection of a person to intentional discrimination—because of the belief that he or she belongs to a given race— that renders such behavior actionable.

*Id.* at 724. Thus, the trier of fact in this case will *not* focus on physiognomic characteristics. Instead, the focus in this court's determination of whether this is an instance of intraracial discrimination will be on the defendant's perception of Hansborough as belonging to a particular group. Or in other words, did the City of Elkhart discriminate against Hansborough because he was born black?

## V. TITLE VII

■ Despite all of this leading to the conclusion that as a purely conceptual matter it is possible for one black person to discriminate against another black person on the basis of race, the problem of proof still remains. For the plaintiff, here, it is a

relatively unique and difficult burden of proof. One has to be very careful to be sure that what in other interpersonal relationships might be described as discrimination is not just plain, ordinary, personal antagonism unrelated to the color of skin. As the Seventh Circuit has noted very recently, " 'Title VII is not a general bad acts statute; it only addresses discrimination on the basis of race, sex, religion, and national origin.... ' " *Hughes v. Derwinski*, 967 F.2d 1168, 1173 (7th Cir.1992) (quoting *Jamil v. Secretary, Department of Defense*, 910 F.2d 1203, 1207 (4th Cir.1990)). This concern causes the court to require a substantial preliminary showing when one black person alleges discrimination by another black person. A careful examination of the pleadings in the case, within the context of Rule 56, simply demonstrates that this plaintiff has failed to make any preliminary showing of discrimination. This is true even given the added concerns this court must consider when addressing a motion for summary judgment in employment discrimination cases where intent is a central issue. *McCoy*, 957 F.2d at 370–371. The record in this case demonstrates without dispute that this employer in no way engaged in racial discrimination as a part of the general employment policy, and there is no showing here whatsoever that this plaintiff was discriminated against in any way because of his sex, his race, and/or his color.

With regard to what a plaintiff alleging a discriminatory discharge must prove, the Seventh Circuit continues to adhere to the test set out in *Andre v. Bendix Corp.*, 841 F.2d 172, 175 (7th Cir.1988) *cert. denied*, 488 U.S. 855, 109 S.Ct. 144, 102 L.Ed.2d 116 (1988).

"The Supreme Court set forth the allocation of the burdens of proof for a Title VII discriminatory treatment case in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817[, 36 L.Ed.2d 668] (1973). *The plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence.* 'A plaintiff alleging a discriminatory firing need show only that [s/he] was fired from a job for which [s/he] was qualified while others not in the protected class were treated more favorably.' To meet her burden of establishing a prima facie case of discriminatory discharge, [the plaintiff] must therefore show both that she was qualified for and satisfactorily performing the duties of her job."

*Kizer*, 962 F.2d at 611–612 (citations omitted) (emphasis added). Thus, in this case, Hansborough must show that he was qualified for the job he held with the defendant and that he was performing the duties of that job satisfactorily.

The City of Elkhart claims that the plaintiff was terminated for the following reasons:

1) repeatedly came to work late;

2) insubordinate to supervisor and other staff members;

3) verbally abused and used profanity in the children's presence;

4) did not fulfill responsibilities on the job, nor did he do what was asked of him; and

5) did not demonstrate respect for or get along with fellow workers.

Additionally, the supervisor of the Mayor's Summer Youth Program, Ben Barnes, states in his affidavit that he attempted on more than one occasion to discuss the above-listed problems with Mr. Hansborough to no avail. Further, Mr. Barnes states,

"that when Mr. Hansborough contacted me with regard to his need for time off work to appear in Court regarding criminal conversion charges, I felt that it would be in the best interest of the program and the children to terminate Mr. Hansborough's employment in light of that and the numerous other problems we had had."

Ben Barnes' Affidavit at ¶ 12.

The plaintiff alleges that the reasons given by the defendant for his discharge are pretextual and only serve to mask unlawful discrimination on the part of the City of Elkhart. Yet, in his complaint to the EEOC, Mr. Hansborough, himself, alludes to his tardiness along with the personality

clashes and difficulties he experienced with other employees. More importantly, however, for purposes of summary judgment, the plaintiff has offered nothing to demonstrate that others of *any* race, color or sex were treated differently. In fact, his statements only support the statements made in Ben Barnes' affidavit. The plaintiff has not demonstrated that he was doing his job well enough to meet the employer's reasonable requirements. Rather, the plaintiff engages in supposition and conjecture that his supervisors and fellow employees were "out to get him." "A subjective belief of discrimination no matter how genuine, cannot be the sole basis for a finding of discrimination." *Kizer*, 962 F.2d at 613. For these reasons, this court holds that the plaintiff has failed to make out a prima facia case of racial or sexual discrimination under Title VII.

## VI. CONCLUSION

Therefore, based upon the foregoing discussion and the facts and authorities cited, it is ORDERED that Defendant City of Elkhart Parks and Recreation Department's Motion for Summary Judgment is GRANTED. IT IS SO ORDERED.