**Tracy L. WALKER, Plaintiff,**

v.

**SECRETARY OF THE TREASURY, INTERNAL REVENUE SERVICE, Defendant.**

**No. 1:87–cv–1789–CAM.**

United States District Court, N.D. Georgia, Atlanta Division.

July 16, 1990.

Tracy L. Walker, Union City, Ga., pro se.

Sylvia Lark Ingram, Office of U.S. Atty., Atlanta, Ga., for defendant.

## ORDER

MOYE, District Judge.

Plaintiff filed a formal complaint with the Internal Revenue Service (hereafter "IRS") on May 1, 1986 alleging that she had been terminated in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Plaintiff, a lighter-skinned black woman, alleged that her supervisor, a darker-skinned black woman, had terminated her because of the lighter color of her skin. Plaintiff also alleged that she was terminated, at least in part, because she had visited an Equal Employment Opportunity ("hereafter EEO") Officer prior to her termination.

On February 12, 1987 an Administrative Law Judge issued a recommendation of no discrimination which was adopted by the Department of Treasury. The following day plaintiff filed a pro se action against the Secretary of Treasury in his official capacity under the Civil Rights Act of 1964, 42 U.S.C. § 2000e as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16, the Administrative Procedure Act, 5 U.S.C. § 701, 42 U.S.C. §§ 1981 and 1983. On February 28, 1989, a United States Magistrate issued a recommendation denying defendant's motion for summary judgment on plaintiff's retaliation claim, and granting defendant's motion for summary judgment on plaintiff's Title VII, Administrative Procedure Act, and §§ 1981 and 1983 claims. On the color discrimination claim, the Magistrate held that: "[W]hile discrimination based on skin color may occur among members of the same race, such discrimination is not the

basis for a cause of action under Title VII.... Although Title VII includes 'color' as one of the basis for prohibited discrimination, that term has generally been interpreted to mean the same thing as race". *Walker v. I.R.S.*, 87–1789 (N.D.Ga. Feb. 28, 1989).

On April 11, 1989 this court adopted the Magistrate's recommendation as to plaintiff's retaliation, §§ 1981, 1983 and Administrative Procedure Act claims, but set aside the Magistrate's recommendation as to plaintiff's Title VII claim. In setting aside the recommendation as to plaintiff's Title VII claim, this court held that intra-racial color-based discrimination claims are authorized by both Title VII and existing Supreme Court precedent.[1]

Pursuant to 42 U.S.C. § 2000e–5 the case was tried before this court in a non-jury trial from January 30, 1990 through February 6, 1990. In short, the court was required to make a finding of fact on two issues: 1) whether plaintiff was terminated because of invidious discrimination on the part of her supervisor; and 2) whether plaintiff was terminated, at least in part, in retaliation for a visit she had made to the IRS's EEO Manager.

The court makes the following findings of fact:

1. The IRS first hired Tracy Walker on December 28, 1984, as an intermittent forms clerk, GS–303–2, in the Seattle, Washington office.

2. She worked a total of 58 days before she was placed in non-pay status at the end of March 1985. (Exhibit D–33 and D–2).

3. Shortly thereafter plaintiff travelled to Atlanta in search of job opportunities with the IRS. She was interested in a permanent career with the federal government. She filed an application for employment with the IRS Atlanta District Office. (Exhibit D–33 and Tr. Vol. I:172). The application indicated the highest grade she had held with the Federal government was a GS–2/3. (Exhibit D–33 and Tr. Vol. I:172).

Her letter of introduction from her supervisor in Seattle read as follows:

I have found Ms. Walker to be very capable, energetic, and hard working. I recommend her for employment in any position. Ms. Walker is particularly adept in dealing with the public and I feel that she would be an asset to any organization.

(Exhibit P–2).

4. On April 22, 1985 plaintiff was hired by Virginia Fite, Supervisor of Fiscal Management Staff, as a GS–2, 30–day clerk-typist. It was officially termed an "emergency" appointment. (Tr. Vol. IV:129–130). The position was funded by the Collection Division. (Tr. Vol. IV:163).

5. Ms. Fite testified that she was hiring for a GS–3 position for which plaintiff did not qualify. However, plaintiff was hired nevertheless because there were no other applicants and the need apparently was urgent. (Tr. Vol. IV:165–166; and Exhibit D–2). At that time the position of budget assistant was essentially vacant because the previous budget assistant had been in the hospital and then had left the District Fiscal Office. To remedy the situation, the budget assistant's duties were delegated to other employees. The duties of posting to the accounts ledger and reconciling with the region were given to the budget analyst. The most difficult bills were given to Ms. Fite. The standard bills were assigned to two, newly-hired, temporary clerks—plaintiff and Jackie Horton. (Tr. Vol. IV:163–164). As a result there was a backlog of work for the position to be filled.

6. Ms. Fite promised plaintiff that she would be promoted to a GS–3 when she became qualified. (Tr. Vol. IV:167).

7. On May 21, 1985, plaintiff was converted from an emergency appointment clerk-typist to a temporary appointment clerk-typist, GS–2, for a period not to exceed one year. (Tr. Vol. IV:130). As a clerk-typist plaintiff's job duties included:

... providing clerical support to the manager and staff members of the Fiscal Staff, answering telephones, making cop-

---

1. *Walker v. Secretary of Treasury, Internal Revenue Service*, 713 F.Supp. 403 (N.D.Ga.1989).

*See also Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987).

ies and maintaining vendor files ... ensuring that all required documentation be kept with the case files ... retriev[ing] [case file] information ... assign[ing] obligation numbers to documents to facilitate payment, processing documents for payment including blanket purchase orders, copy machine invoices, GSA store purchases, summons, advertisements, gasoline, and other Internal Revenue Service bills ... typing a variety of reports, letters to vendors and other items.

8. In order to become a clerk-typist plaintiff passed a typing proficiency examination, typing sixty-two words per minute.

9. On July 7, 1985, plaintiff's grade level was converted from GS–2 to GS–3. Her appointment, however, remained temporary. The promotion to GS–3 came at the recommendation of Ms. Fite. In a written recommendation to her supervisor, Ms. Fite stated:

> John, when Tracy was hired she did not qualify for the GS–3 position and was brought on as a GS–2. She is now eligible.
>
> As she is performing her duties above a fully acceptable level, I recommend that you approve her promotion.

(Exhibit P–3).

10. When the funding for the temporary position ran out, Ms. Fite recommended that plaintiff be converted to permanent status, GS–3. (Tr. Vol. IV:168). At trial, Ms. Fite testified that her standards for a permanent employee were much higher than her standards for a temporary employee and that she believed, at the time, that plaintiff would perform above the minimum standard to become a permanent employee with the IRS. (Tr. Vol. I:82). Plaintiff was converted to a permanent position on December 8, 1985. The conversion process was unusually long because plaintiff had scored so low on the OPM register.[2] (Tr. Vol. IV:132).

11. Ms. Fite testified that she initially thought plaintiff was a better than average performer; but after a time, concluded that plaintiff was doing only adequate or satisfactory work. (Tr. Vol. IV:171). She testified that although plaintiff was energetic, she had typing problems, was immature, and was too headstrong. (Tr. Vol. IV:171).

12. Ms. Fite gave the following recommendation for plaintiff when she was in search of outside employment:

> It has been a pleasure to have Tracy as a member of my staff. She learns quickly and has assumed responsibility for a significant portion of the invoice processing for the district office. I am particularly impressed with her initiative. We can count on Tracy to complete her work accurately without close supervision.... I would recommend her highly for any position and feel confident that she will be able to handle the additional responsibility.

(Exhibit P–4).

13. At trial, Ms. Fite testified that she embellished the latter recommendation, and that her earlier statements as to plaintiff's competence and accomplishments were exaggerated. (Tr. Vol. V:24–25). This court finds Ms. Fite's testimony credible.[3]

14. Ms. Lewis came to work in the Fiscal Office on November 11, 1985. (Tr. Vol. II:6, IV:36). She had previously been in another office in Atlanta. She replaced Virginia Fite. She was to be the supervisor of Tracy Walker, Jackie Horton and Carla Endsley, all black employees, and Carol Bentley, a white employee. After a period of time, Angel Roberts, a black employee, relocated to the Fiscal Office.

15. Prior to the time Ms. Lewis became the Fiscal Officer, there were indications from customers, centralized procurement,

---

**2.** The OPM register is a list of candidates competing for "clerical-type" positions who are listed in order according to a rating compiled by using such factors as the quality of their application, test scores, etc.

**3.** In this court's experience there is a widespread practice by supervisors of painting a misleading recommendation picture for their employees. That practice produces a substantial number of discrimination lawsuits and obscures the legitimate reasons for which the employer may have terminated an employee.

and the regional office, that there were problems in the Fiscal Office. (Tr. Vol. IV:35).

16. At the time Ms. Lewis became the Fiscal Officer, Paul Sandell, Chief of the Resource Management Division, instructed her to: 1) immerse herself in the procedures of the fiscal staff, 2) learn all the work of the office, and 3) look into the performance of all the members of the fiscal staff, a "new broom" so to speak. (Tr. Vol. IV:36).

17. Ms. Lewis testified that almost immediately upon becoming the Fiscal Officer she began to experience problems with plaintiff. (Tr. Vol. II:31).

18. Ms. Lewis testified that on or about December 6, 1985 she began taking notes (or a "diary") about her problems with plaintiff at the suggestion of Mr. Sandell. She further testified that the notes were intended as memory ticklers and were not intended to be all inclusive of plaintiff's problems. The notes, or "diary", contained nothing positive about plaintiff. (Tr. Vol. II:49 and V:93).

19. Ms. Lewis testified that plaintiff refused to answer the telephones, file, or make photocopies.

20. Ms. Lewis testified that plaintiff had problems in processing Fedstrips. Ms. Lewis learned of plaintiff's deficiencies in this area from Anitia Owens, a white female. (Tr. Vol. II:127–129; V:59, 77–81).

21. Ms. Lewis testified that plaintiff had problems with duplicate payments and duplicate estimates. These problems were brought to Ms. Lewis's attention by Angel Roberts. (Tr. Vol. V:52–58, VI:3–4).

22. Ms. Lewis testified that plaintiff had problems with general bill paying, e.g., Citizen's Jewelry account, copy machine invoices, research, etc. These problems were brought to Ms. Lewis's attention by Carol Bentley, a white female. (Tr. Vol. VI:4).

23. Ms. Lewis was not involved in the day-to-day billing and paying operation unless some problem was brought to her attention by someone else. (Tr. Vol. VI:4–5).

24. Ms. Lewis counseled plaintiff numerous times concerning alleged problems with her work. She testified that she counseled plaintiff in private about her attitude, misconduct and performance problems. (Tr. Vol. II:26, V:90).

25. On January 9, 1986, Ms. Lewis called a meeting of her employees. Carol Bentley, a white female, was excluded from that meeting.

26. Plaintiff testified that at this meeting Ms. Lewis indicated that the fiscal office needed to be precise in its work because when Angel Roberts began her assignment in the fiscal office, the office personnel would become predominantly black and the office would thus be placed under greater scrutiny.

27. On February 4, 1986, Ms. Lewis testified that she gave plaintiff a memorandum setting forth job expectations. (Tr. Vol. II:150–151). The purpose of this memorandum was to confirm performance expectations that Ms. Lewis had discussed with plaintiff.

28. The problems between plaintiff and Ms. Lewis did not subside. Plaintiff went to see Virginia Fite and asked her if she knew why Ms. Lewis was criticizing plaintiff's work. Plaintiff showed the memorandum to Ms. Fite. (Tr. Vol.IV:177).

29. An entry in Ms. Lewis's notes on March 3, 1986 states that plaintiff "still" wanted to see Sidney Douglas, an EEO officer at the IRS.

30. On March 3, 1986 and on subsequent dates, plaintiff met with Sidney Douglas to discuss some of her problems with Ms. Lewis as well as discuss career goals and methods of achieving advancement in the IRS. The function of the IRS EEO officer is to ensure fair treatment of employees without regard to race, color, sex, age and national origin, i.e. to ensure compliance with the equal opportunity laws. Ms. Lewis indicates in her diary that plaintiff's "complaint" to Mr. Douglas was strictly about Ms. Lewis denying her leave. Mr. Douglas made it clear to plaintiff that if she wanted to file an EEO complaint, she would have to contact a counselor. He also explained that if she wanted to file a union

grievance, she would have to contact a union steward. (Tr. Vol. III:72–73, 80).

31. Ms. Lewis testified that she was not a personal friend of Mr. Douglas. (Tr. Vol. II:76).

32. Mr. Douglas testified that from January to March of 1986, he visited Ms. Lewis two or three times. (Tr. Vol. III:84).

33. Jackie Horton testified that Mr. Douglas was in Ms. Lewis's office two or three times a week.

34. Ms. Lewis testified on cross examination that she could not recall Mr. Douglas ever visiting her office. (Tr. Vol. II:76–77).

35. Sidney Douglas admitted that in his conversation with plaintiff he stated that he could not "see" a black employee discussing a problem about a black supervisor with a white supervisor. (Tr. Vol. III:85). There is no evidence that Mr. Douglas participated in the termination decision under attack.

36. At some point plaintiff went to complain to Paul Sandell. Her complaint centered around her problems with Ms. Lewis. Mr. Sandell called a meeting with plaintiff and Ms. Lewis and directed them to seek a counselor to work out their differences.

37. Paul Sandell instructed Ms. Lewis and plaintiff to see Mary Alice Hines to resolve their differences. He indicated to the court that he had wished to eliminate any personality problems that might have been causing the difficulties in the fiscal office.

38. After consulting with Personnel and Ms. Lewis about possible options, Mr. Sandell made the decision to terminate plaintiff's employment. (Tr. Vol. IV:43).

39. The position which plaintiff occupied remained vacant following her termination due to a hiring freeze in the division. After the freeze was lifted, the position was filled by an allegedly "darker-skinned" black female.

40. Ms. Lewis testified that although she had considered transferring plaintiff to another division, she did not recommend terminating her. However, Paul Sandell's affidavit indicates that he wrote the letter of plaintiff's termination as a result of having "decided to approve *the recommendation* to terminate the employee". (Exhibit P–11) (emphasis added). Mr. Sandell testified, after reviewing said affidavit, that "apparently" he did terminate plaintiff on Ms. Lewis's recommendation. (Tr. Vol. IV:58). The court does not find this apparent inconsistency significant and holds that the catalog of plaintiff's alleged faults referred to Mr. Sandell might well not have been considered a "recommendation" by Ms. Lewis but might so have been considered by Mr. Sandell.

41. One of the reasons given for plaintiff's termination was her regular tardiness. Ms. Lewis regularly confronted plaintiff about her alleged tardiness.

42. Jackie Horton and Carla Endsley were late to work two or three times a week. (Tr. Vol. III:36, 99).

43. Three other reasons given for terminating plaintiff were that she: 1) made duplicate payments; 2) had problems with general bill paying; and 3) failed to answer the telephone. (Exhibit P–6).

44. Ms. Fite testified that it was not within Ms. Bentley's normal course of duties to know whether there were double payments. (Tr. Vol. V:16). Ms. Fite testified that both Ms. Endsley and Ms. Horton had made double payments. (Tr. Vol. II:15, 21).

45. Another reason for plaintiff's termination was her actions and attitudes regarding a request for two weeks of leave she needed in order for her to participate in job training for another job. The request was denied. Ms. Lewis testified that she asked Ms. Horton and Ms. Endsley what their workload was like during this time period in the event plaintiff's request was granted. Apparently Ms. Horton did not want to help out and Ms. Endsley would be tied up. The request was also made when a major budget review was due. (Tr. Vol. V:96). Ms. Lewis also spoke with Mr. Sandell who approved the denial of the request. (Tr. Vol. V:96).

46. Carla Endlsey testified that Ms. Lewis treated plaintiff differently than the others in the office; although sometimes she treated plaintiff "nice". (Tr. Vol. IV:11–12). Ms. Endsley also testified that Ms.

Lewis would orally reprimand her (Ms. Endsley) when she did something wrong. (Tr. Vol. III:99).

47. Jackie Horton, Carla Endsley and Angel Roberts never witnessed plaintiff being disrespectful to Ms. Lewis.

48. Ms. Fite testified that she felt plaintiff "looked down" on Southern blacks. Nobody else in the office testified to such a perception. Ms. Fite was not aware that plaintiff had married a Southern black person.

49. There were two expert witnesses, Dr. Ronald Hall and Dr. Midge Wilson, who testified on intraracial perceptions of skin tone within the black community. It was their conclusion that some darker-skinned blacks may have a feeling of inferiority in dealing with lighter-skinned blacks which may sometimes result in hostile or prejudicial treatment of the latter by the former.

## CONCLUSION

Defendant maintains that plaintiff's termination was based on her poor performance, poor attitude and misconduct. Plaintiff argues that the latter reasons were merely a pretext and that she was really terminated because of a color-based prejudice Ms. Lewis had toward plaintiff. This court holds that plaintiff has failed to meet the burden of proving by a preponderance of the evidence that her termination was the result of such a prejudice and that defendant's stated reasons were merely pretextual.

The only significant evidence that plaintiff offered that, if true, would tend to prove that Ms. Lewis did indeed have feelings of prejudice toward plaintiff are some derogatory personal comments that Ms. Lewis allegedly made to plaintiff, such as: "you need some sun", "you think you're bad, you ain't about nothing, you think you're somebody, I can do what I want to do to you", "why don't you go back to where you belong?", and "why did you come down here?". However, this court holds that plaintiff has failed to prove by a

preponderance of the evidence that the comments were in fact made. Other than the testimony by plaintiff, the record is devoid of any testimony or evidence that would lead this court to believe that Ms. Lewis would be likely to make such comments. There was no meaningful testimony that Ms. Lewis was color-biased. There was no testimony from any of the witnesses, other than from plaintiff, that any of them were ever aware of an underlying color-based bias on the part of Ms. Lewis. Nor was there testimony from any of the witnesses, other than from plaintiff, that Ms. Lewis exhibited any behavior that would suggest such a bias. None of the witnesses at trial, other than plaintiff, heard any of the alleged comments, nor any other similar comment or suggestion by Ms. Lewis.[4]

But even if the comments *were* made, plaintiff has failed to prove that they were uttered for any reason other than the personal animosity that the two individuals might have had for each other. It appears undisputed that there was a personality conflict between plaintiff and Ms. Lewis, and that Ms. Lewis was not wholly innocent in the propagation of the conflict. However, a personality conflict alone does not establish invidious discrimination. There is ample evidence in the record to support defendant's contention that the reason for the personality conflict, and likewise the subsequent termination of employment, was plaintiff's performance on the job. Plaintiff maintains that many of the shortcomings in her performance that were given as the reason for her termination were merely a pretext on the part of the defendant as evidenced by the fact that other employees in the office had the same alleged shortcomings *i.e.* tardiness, clerical errors, etc. While this court recognizes that some of the other employees had similar shortcomings, it is nonetheless satisfied that plaintiff's case was different in kind. There was considerable testimony not only from Ms. Lewis but from others,

---

**4.** Plaintiff alleges all the comments were made to her behind closed doors with no one else present.

that plaintiff, unlike her fellow employees, may have been insubordinate, immature, impatient, disrespectful and unmanageable. It also appeared that plaintiff was dissatisfied with her position, an attitude which manifested itself on the job. In short, although "it takes two to tango", and one of the two in this case was undoubtedly Ms. Lewis, plaintiff's working attitude appears to the court to have been the cause of her termination.

Plaintiff has failed to prove by a preponderance of the evidence that she was terminated because of invidious discrimination on the basis of color on the part of Ms. Lewis. Conversely, defendant has offered legitimate reasons for plaintiff's termination which the court finds non-pretextual.

Precisely the same reasoning applies to plaintiff's retaliation claim. While it is true that plaintiff visited an EEO officer prior to her termination, plaintiff has failed to prove by a preponderance of the evidence that the visit was part of the reason for the termination. As mentioned, this court is convinced that plaintiff was terminated because of the legitimate reasons stated above.

Therefore the clerk is directed to ENTER JUDGMENT in favor of defendant and against plaintiff as to the complaint.

SO ORDERED.