Astrid Castro FRANCESCHI, et al., Plaintiffs,

v.

HYATT CORPORATION, et al., Defendants.

Civ. No. 88-0285(PG).

United States District Court, D. Puerto Rico.

Jan. 16, 1992.

Harry Anduze, Hato Rey, P.R., for plaintiffs.

Keith A. Graffam, Old San Juan, P.R., for defendants.

## OPINION OF THE COURT

PEREZ–GIMENEZ, District Judge.

### I. Nature of the Case

In this case, the Court considers an issue of considerable import to civil rights, namely, whether 42 U.S.C. § 1981 prohibits the exclusion, on the basis of race, ancestry, or ethnic background of non-registered guests to a privately owned hotel with a facially neutral "no visitors policy," *see* Defendant's Motion For Partial Reconsideration p. 4, but which allegedly excludes guests on impermissible grounds. The Court also considers the novel question whether intraracial discrimination is actionable under § 1981. This Court answers both question in the affirmative. We hold, in light of *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1990), *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) and *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987), that § 1981 affords plaintiffs a remedy for the alleged wrong; therefore, Defendant's Motions for Dismissal And/Or Summary Judgment and For Partial Reconsideration must be denied.

### II. Summary of Facts

A summary of the facts is a necessary prerequisite for a pellucid understanding of the interesting and novel issues raised by this case. Even though the parties, through a plethora of documents filed with this Court over a two year period, have bitterly contested virtually every statement of fact, we accept as true the facts alleged by the plaintiff for defendant moves for dismissal for failure to state a cause of action and or summary judgment. F.R.C.P. 12(b)(6); *Chongris v. Board of Appeals*, 811 F.2d 36, 37 (1st Cir.1987), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987) (When considering a motion for summary judgment the court will interpret the facts "in the light most flattering to the plaintiff's cause ... exempt[ing], of course, those 'facts' which have since been conclusively contradicted by plaintiff's concessions or otherwise, and likewise eschew[ing] any reliance on bald assertions, insupportable conclusions, and 'opprobrious epithets.' ").

Plaintiffs, Ms. Astrid Castro Franceschi, Esq., and Annette Nogueras, seek damages and injunctive relief for the alleged refusal by Hyatt Cerromar Hotel[1] (the "Hotel") to admit Ms. Castro's son, Miguel A. Nogueras, Esq., and daughter in law, Ms. Barbara F. Blanco, into its premises.[2]

On March 26, 1987, Ms. Castro and Ms. Nogueras registered as guests of the Hotel purportedly to attend an important 936 conference. Amended Complaint at par. 12. Ms. Castro invited Mr. Nogueras and Ms. Blanco to spend the afternoon at the Hotel and remain for dinner at the Hotel's restaurant. Id., at par. 14. Co-plaintiffs Nogueras and Blanco allege that upon arrival, they were denied entrance to the Hotel's premises by the guard on duty.[3] According to co-plaintiffs, the guard informed them of the Hotel's no visitors policy and denied them access to the premises. Id., at par. 15. They were also informed that in order to contact Ms. Castro, they would have to drive to a public telephone down the road from the Hotel. Id.

Mr. Nogueras begrudgingly complied. He reached the public phone, contacted Ms. Castro at the Hotel, and explained the situation. After telling Mr. Nogueras that she would take care of the matter, Ms. Castro proceeded to the front desk of the Hotel. Id. At the front desk, Ms. Castro informed the clerk on duty that her son and daughter were at the gate, that they had been denied access to the premises, and that they were her invitees for the afternoon. Ms. Castro was then informed of the Hotel's no visitors policy. Id.

Unsatisfied with the explanation, Ms. Castro asked to see the manager, Ms. Carmen Garcia, who in essence repeated the Hotel's policy and reiterated that her invitees could not enter the premises. Id., at par. 16. Ms. Castro, a lawyer, protested that these were her guests and added that, pursuant to both state and federal law, they could not be denied access to a public accommodation such as the Hotel. Id.

It is here that the nub of the controversy and therefore the more hotly debated sequence of events allegedly took place. After contacting Ms. Castro, Mr. Nogueras and Ms. Blanco returned to the guard post at the entrance of the Hotel premises to await further instructions from Ms. Castro. Co-plaintiffs allege that while waiting at the gate,

> ... the guard would consistently admit anyone whose main language was English and denied admittance to Spanish speaking visitors thus enhancing co-plaintiffs [sic] humiliation of being denied access to the hotel's premises on the basis of their ethnic origin and language. Nogueras was also informed by an employee of the hotel that 'This management is prejudiced agaisnt [sic] people of our race' (meaning Puerto Ricans).

Amended Complaint at par. 19.

Defendant, Hyatt Hotels of Puerto Rico,[4] strenuously denies allegations that the Hotel, its management, officers or agents have ever had a hotel policy of racial or ethnic discrimination on the basis of visitors' hispanic ancestry and categorically denies that its management has ever excluded or denied access to anyone on the basis of the same. Answer to Amended Complaint at pp. 4–5. The Hotel emphasizes that 90% of its registered guests are of Puerto Rican descent. Because of this fact, it submits that it is illogical to assert

1. Hyatt Regency Cerromar Hotel is wholly owned by Hyatt Hotels of Puerto Rico, Inc., a corporation organized under the laws of the state of Delaware and is located in Dorado, Puerto Rico. Amended Complaint at p. 2.

2. Mr. Nogueras and Ms. Blanco join Ms. Castro and Ms. Nogueras as co-plaintiffs in the present case.

3. According to plaintiffs, the guard on duty that day was Mr. Segarra. Mr. Segarra, however, does not recall (1) whether he was on duty that particular date, and (2) does not remember the alleged encounter with Mr. Nogueras and Ms. Blanco. Pedro A. Segarra's Deposition at pp. 23–25.

4. By Unpublished Opinion and Order dated September 25, 1990 (hereinafter September 25, Order), this Court dismissed those allegations in the Amended Complaint which purported to state actions against Hyatt and Dorado Beach Corporation for lack of in personam jurisdiction.

that the Hotel has ever had a discriminatory hotel admission policy.[5]

### III. Present Procedural Posture

In this action, plaintiffs seek money damages for violation of their civil and constitutional rights, injury to their integrity and reputation, infliction of emotional and mental anguish and "insidious" discriminatory practices. Plaintiffs also request attorney fees pursuant to 42 U.S.C. § 1988. As the statutory bases for a cause of action, plaintiffs allege violations of 42 U.S.C. §§ 1981, 1988 and 2000a–1, 2000a–2, 2000a–3 & 2000a–6. Amended Complaint at par. 3. Not surprisingly, defendants deny, in essence, each and every allegation raised by the plaintiffs save the fact that one of four plaintiffs, Ms. Castro, was a registered guest of the Hotel when the alleged violation took place.

Following plaintiff's Amended Complaint And Defendant's Motion To Dismiss And/Or For Summary Judgment, a deluge of motions contributing niggardly to form or substance ensued. On September 25, 1990, this Court entered an Opinion and Order (1) granting summary judgment and dismissal of claims filed against Hyatt Corporation, (2) finding that plaintiffs stated a cognizable claim under 42 U.S.C. § 1981 *et seq.* and 42 U.S.C. § 2000a, and (3) instructing the parties to file legal briefs on the question whether in light of *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), intraracial discrimination is actionable under § 1981 *et seq.* 747 F.Supp. 138.

On October 18, 1990 defendants filed a Motion For Extension Of Time, where, for the first time, it was suggested that plaintiffs' action should be dismissed on the further ground that the scope of § 1981 had been curtailed by *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (hereinafter *"Patterson"*). Defendant Motion For Extension Of Time at par. 3. Although this Court finds both plaintiff and defendant's analysis in this area lacking, it is bound by the *Patterson* decision and must therefore reconsider its earlier finding in light of the aforementioned case. Upon review, this Court still adheres to its earlier findings and holds that the "full and equal benefit of all laws" clause of § 1981 affords plaintiff a cause of action. It further finds that § 1981 does not have a state action requirement and that claims of intra-racial discrimination are actionable under the section.

### IV. Legal Analysis

#### A. *Background History*

In the aftermath of the Civil War, Congress enacted, in 1866 and again in 1871, a series of civil rights statutes with the intent of implementing the Thirteenth, Fourteenth, and Fifteenth Amendments. Of particular interest in this case are the first two sections of the Civil Rights Act of 1866: 1981 and 1982. Section 1981 primarily concerns itself with racial discrimination in contractual relationships while section 1982 addresses discrimination in property transactions. Both statutes were enacted pursuant to authority granted to Congress by the Thirteenth Amendment of the United States Constitution. *See e.g. Tillman v. Wheaton–Haven Recreation Ass'n*, 410 U.S. 431, 440 n. 11, 93 S.Ct. 1090, 1095 n. 11, 35 L.Ed.2d 403 (1973); *In re Civil Rights Cases*, 109 U.S. 3, 22, 3 S.Ct. 18, 29, 27 L.Ed. 835 (1883). As initially drafted, they were intended to "break down all dis-

---

5. As we have stated before, this datum is irrelevant. Defendants make much of the asserted fact that 90% of the Hotel's guests are of Puerto Rican descent. *See e.g.* Defendant's Motion For Partial Consideration at par. 3. Plaintiffs clearly point out, and this Court explicitly so found in its September 25 Order, that this case does not involve discriminatory practices in hiring or "scheduling of reservations." *See* September 25 Order at p. 9, n. 4. We reiterate that, as regards this case, the issue is simply whether exclusion of unregistered guests on the basis of race or

ethnicity by those of the same race is legally permissible. We also reiterate our two previous findings: (1) that plaintiff's pleadings disclose not only allegations based on national origin but also racial and ethnic discrimination, *see Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987), and (2) that plaintiff need not submit proof of purposeful discrimination in order to state a cause of action. *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

crimination between black men and white men." Cong.Globe, 39th Cong., 1st Sess. 599 (1866); remarks of Senator Trumbull, Chairman of the Judiciary Committee and chief proponent of the bill embodying both sections.

Seldom evoked prior to 1968, the civil rights statutes in general and § 1982 in particular became increasingly popular after the Supreme Court's decision in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). *Jones*'s holding to the effect that § 1982 proscribed private as well as public discrimination, presented a unique opportunity for redress to aggrieved parties who were the subject of private discrimination. The following year, the Court went a step further and decided, given the similarities in language construction between § 1981 and § 1982 and the absence of a state action requirement under the Thirteenth Amendment, that private discrimination in the creation and enforcement of contracts was actionable under § 1981. *Tillman v. Wheaton–Haven Recreation Ass'n*, 410 U.S. 431, 439–40, 93 S.Ct. 1090, 1094–95, 35 L.Ed.2d 403 (1973).

Since then, section 1981 has been recognized by courts and treatises as protecting at least four distinct interests: (1) contractual rights (protected by the so called "contract clause"), (2) access to judicial process, (3) full and equal benefit of all laws (the "equal benefits clause"), and (4) subjection to punishment. *See* J.G. Cook and J.L. Sobieski, Jr., *Civil Rights Actions*, at pp. 5–14, 5–24, par. 5.03 (hereinafter referred to as the "Treatise").

More recently, however, the scope of § 1981 has been cast into doubt by the Supreme Court's decision in *Patterson*. In *Patterson*, petitioner—a black woman—worked for defendant, a credit union, for ten years before being laid off. Following the layoff, petitioner brought a § 1981 claim alleging discriminatory promotion practices and racial harassment. Such treatment, she asserted, was prohibited by the right to contract clause found in § 1981.

The Supreme Court found that § 1981 "prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only in discriminatory terms." *Patterson*, 491 U.S. at 176–77, 109 S.Ct. at 2372–73. It also found that post contractual behavior, including "breach of the terms of the contract or imposition of discriminatory working conditions," did not implicate the right to contract clause and was, therefore, not actionable pursuant to § 1981. 491 U.S. at 177, 109 S.Ct. at 2373.

■ In this court's opinion, *Patterson* heralds a retrenchment from the expansive interpretation philosophy previously held by the Supreme Court in the area of civil rights statutes in general and § 1981 in particular. *See e.g. Wilmer v. Tennessee Eastman Company*, 919 F.2d 1160, 1165 (6th Cir.1990) (Jones, Circuit Judge, dissenting) ("Our majority opinion places this circuit in the line of march with those who are, needlessly, in my judgment, in retreat on civil rights enforcement.") Until the *Patterson* decision, an era of expansive interpretation of civil rights statutes reigned unchallenged, attesting to "a firm national policy to prohibit racial segregation and discrimination." *Id.*, 491 U.S. at 191, 109 S.Ct. at 2380 (Brennan, J., concurring in the judgment in part and dissenting in part). In the words of Justice Stevens, concurring in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415: "The policy of the Nation as formulated by the Congress in recent years has moved constantly in the direction of eliminating racial segregation in all sectors of society. This Court has given a sympathetic and liberal construction to such legislation." *Id.*, 491 U.S. at p. 191, 109 S.Ct. at p. 2380.

This retrenchment was not unexpected. *See e.g. Red Elk v. Vig*, 571 F.Supp. 422 (D.S.D.1983). Its seeds were planted as early as Justice White's dissenting opinion in *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). This much was explicitly recognized by Justice Kennedy's verbatim adoption of Justice White's dissent in *Runyon:*

One cannot seriously contend that the grant of *other rights* enumerated on § 1981 [that is, other than the rights to make contracts,], i.e., the rights to 'sue, be parties, give evidence,' and 'enforce contracts' accomplishes anything other than the removal of legal disabilities to sue, be parties, give evidence, and 'enforce contracts.' *Indeed, it is impossible to give such language any other meaning.*

*Patterson*, 491 U.S. at 178, 109 S.Ct. at 2373, *citing Runyon*, 427 U.S. at 195, n. 5, 96 S.Ct. at 2606, n. 5. (emphasis supplied).

As noted by Justice Brennan, the contractual clause of § 1981 is today given the narrowest of readings by the Supreme Court. *Patterson*, 491 U.S. at 189, 109 S.Ct. at 2379. This reading is confined only to "enumerated rights within its express provision." *Id.* at p. 181, 109 S.Ct. at p. 2375. It is thus clear that for plaintiffs to obtain relief, they must first state a cause of action within the express protection of § 1981.

The *Patterson* decision leaves open two distinct possibilities in the interpretation of § 1981. First, that § 1981 affords redress only in those cases where a contractual relationship—narrowly defined as the making or enforcement of contracts—is involved. Although perfectly plausible, the *Patterson* decision does not and, indeed, could not go that far. In *Patterson*, the Supreme Court restricted the causes of action cognizable under § 1981 to those specifically encoded in the section. It then stated that for the factual scenario before it: "... *the relevant provision* in § 1981 protects two rights: 'the same right ... to make ... contracts' and the same right ... to ... enforce contracts." *Id.* at 176, 109 S.Ct. at 2372. (Emphasis supplied). It did not—correctly, we believe—address the meaning or scope of the rest of the language found in 1981. Thus, the equal benefit clause remains virgin territory insofar as Supreme Court decisions are concerned.[6]

A second possible interpretation, and the one suggested by Treatise, is that the equal benefit clause of § 1981 allows enforcement of other than traditional contractual relations.[7] Treatise at pp. 5–18 through 5–24, par. 5.03[C]; *see, e.g., Resident Advisory Bd. v. Rizzo*, 425 F.Supp. 987 (E.D.Pa.1976), *modified*, 564 F.2d 126 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978) (Public housing).

This Court finds itself at a crossroads with no explicit guidance from the First Circuit or the Supreme Court. If we limit § 1981 to the enumerated rights within its express protection, and these rights refer only to a limited set of contractual relations, there being no contract in our case, nor the intent to form one, we are left with the unpalatable result that non-registered guests seeking entrance to private public accommodations to visit family members may be discriminated on the basis of race.

We find, however, that the case of *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978), sheds significant light on the meaning and scope of the equal benefit clause. In *Mahone*, two black citizens of Pennsylvania brought a civil rights action pursuant to 42 U.S.C. §§ 1981, 1983 and 1985 against police officers of the city of Pittsburgh. They alleged, inter alia, that while driving motor vehicles they were stopped by defendants without reasonable cause, subjected to physical and verbal harassment, handcuffed, and falsely charged. *Mahone*, 564 F.2d at p. 1020.

In determining whether plaintiffs stated a claim under § 1981, the court reviewed the scarce precedent interpreting the equal benefit and the like punishment clause of § 1981. It noted that the meaning of the two clauses had "not been considered by the Supreme Court or by any of the various circuit courts of appeals." *Id.* at p. 1027. Finding a cause of action, the court stated:

---

6. Similarly, our research failed to disclose any case in the First Circuit that could shed light on the meaning or scope of the equal benefit clause.

7. Treatise at pp. 5–18 through 5–2, par. 5.03[C].

To read the language of the statute as applying only to the right to contract ignores the clear and vital words of the majority of its provisions. *Despite the sparsity of precedent, a natural and common sense reading of the statute compels the conclusion that section 1981 has broad applicability beyond the mere right to contract.*

*Id.*, at p. 1028 (emphasis supplied).

We find ourselves in a position similar to that described by the Third Circuit and thus echo its words: "... Supreme Court cases have construed only the first of section 1981's enumerated rights—the right to make contracts." [8] *Id.* at 1029. *Patterson* has not changed the validity of this statement. Although, arguably, an expansive reading of the contract clause of § 1981 is now suspect in light of *Patterson*, the restrictive interpretation of the contracts clause in that case is nothing more than dicta as regards the equal benefit clause. Absent a clear statement to the contrary by the First Circuit or the Supreme Court, this Court is reluctant to rule out the existence of a cause of action pursuant to the equal benefits clause of § 1981 where a person is denied access to "private public accommodations" as such statutory phrase is defined by 42 U.S.C. § 2000a–1, 2000a–3.

### B. *State Action*

█ It is proposed by defendant, however, that even if the equal benefit clause transcends contractual rights, plaintiffs must still fail to state a cause of action because the language of the clause implies a state action requirement. Defendant Motion In Compliance With Court Order And Legal Memorandum On Issue Of Racial Discrimination Between Private Parties Under Section 1981 Of The Civil Rights Act (hereinafter "Defendant Motion In Compliance") at pp. 13–15. This much, defendant correctly points out, was suggested by the *Mahone* decision: "... while private discrimination may be implicated by the contract clause of 1981, the concept of state action is implicit in the equal benefits clause." 564 F.2d at p. 1029. However, the *Mahone* decision did not speak authoritatively on the issue, for plaintiffs therein had alleged state action in their complaint. *Id.* at 1030. Thus, the court had no opportunity to pass on the question of a possible state action requirement.

This Court rejects the state action requirement interpretation of the equal benefit clause. In *Tillman*, the Supreme Court noted that neither the Thirteenth Amendment nor § 1981 had a state action requirement. *Id.* 410 U.S. at 435. It then recognized that the same rationale used to find no state action requirement under § 1982 in *Jones* was applicable to § 1981. *Id.; see also Jones v. Alfred H. Mayer*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (private action cognizable under § 1982).

This Court believes that, given the opportunity, the Supreme Court would likely find that the equal benefit clause of § 1981 does not have a state action requirement for the same reasons that it found no such requirement in § 1982 actions in *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987) (Jewish people state a cause of action for private discrimination under § 1982) and *Jones*, 392 U.S. 409. In further support of this interpretation, we further note and express our agreement with the Treatise's comment on the question of a state action requirement: "there simply is no historical basis for imposing a state action requirement on selected portions of the statute." *See* Treatise at p. 5–22, par. 5.03[C], *citing* Comment, Developments in the Law—Section 1981, 15 Harv.Civ.Rts–Civ.Lib.Rev. 29, 135–38 (1980), at p. 136. We will not adhere to the dubious and illogical position

---

**8.** At least one other court has remarked on the scarcity of opinions construing the meaning of the equal benefit clause of § 1981. In *Rafferty v. Prince George's County*, 423 F.Supp. 1045, 1062 (D.Ct.Md.1976), the court noted:

The difficulty with reliance upon § 1981 for a cause of action ... is that his section has seldom been used outside of suits involving contract discrimination.... Notwithstanding lack of judicial precedent, the Court believes that one's rights under this section are violated by a racially motivated detention, interrogation, and investigation by police officers. *A contrary holding would delegate the above language to meaningless phraseology.*

that the first half of § 1981 does not have a state action requirement while the second does.

### C. Race, Ethnicity or Nationality

Our inquiry, however, does not end here. Defendant argues that even if race-based exclusions are actionable under § 1981, plaintiffs may not obtain relief because their claims state discrimination on the basis of nationality as Puerto Ricans and not on the basis of race. Defendant Motion In Compliance at pp. 7–10. Therefore, defendant contends, plaintiff is unable to obtain relief because discrimination on the basis of nationality is not actionable under § 1981. *Saint Francis v. Al–Khazraji*, 481 U.S. 604, 107 S.Ct. 2022 (1989).

Defendant also contends that even if this Court finds that plaintiff's allegations state a claim of discrimination, they may not recover because Puerto Ricans are not a race for purposes of § 1981. Defendant Motion In Compliance at p. 10.

Defendant further asserts that, even if Puerto Ricans admit of classification as a race, plaintiffs in particular do not fall under the protection afforded by the statute because they are "white, convinced they are of European ancestry, and do not have a skin color or ethnic characteristics which could be classified into a race (Puerto Rico) protected by section 1981." Defendant Motion In Compliance at p. 10.

Finally, defendant affirms that, even if plaintiffs state a cause of action under § 1981, the action must still be dismissed because intra-racial discrimination is not actionable pursuant to § 1981. Defendant Motion In Compliance at p. 8. We address each argument in seriatim.

### 1. Nationality

■ While it has been recognized that birthplace alone is insufficient to state a cause of action under § 1981, *see Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 614, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (Brennan, J., concurring), courts have

noted that particular groups may be the subject of double discrimination, that is, discrimination on the basis of more than one ground. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 107 S.Ct. 2019, 95 L.Ed.2d 594 (1987); *Marlowe v. Fisher Body*, 489 F.2d 1057 (6th Cir.1973). In *Shaare* and *Marlowe*, it was recognized that persons of Jewish descent could be the subject of intertwined racial and religious discrimination. While both courts agreed that religious discrimination was not actionable (*Marlowe* under § 1981 and *Shaare* under § 1982), they nevertheless recognized the possibility that discrimination on the basis of race could exist side by side with religious persecution.

This court is convinced that the logic and holding in *Marlowe* and *Shaare*—recognizing that persons of Jewish descent could be the subject of both race and religious discrimination under § 1982—is equally applicable and persuasive in the case at bar. In this respect, this Court considers the words of Justice Brennan in this respect particularly illuminating:

> It is true that one's ancestry—the ethnic group from which an individual and his or her ancestors are descended—is not necessarily the same as one's national origin—the country 'where a person was born, or, more broadly, the country from which his or her ancestors came.' ... *Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group.*

*Saint Francis*, 481 U.S. at 614, 107 S.Ct. at 2028. (Emphasis supplied and citations omitted).

In their Amended Complaint, plaintiff explicitly alleges that the guard on duty stated that the Hotel's management was "prejudiced against people of our race." Amended Complaint at par. 19. We find that Puerto Ricans may indeed be the subject of discrimination on the basis of nationality as well as race or ethnicity and we so hold today.[9]

---

**9.** The factual inquiry whether the guard actually stated that the Hotel's management was preju-

diced against people of the Puerto Rican race, we reiterate, is credibility issue which only the

## 2. Puerto Ricans As A Race

■ Defendants also take the position that, at the time of § 1981's enactment, Puerto Ricans were not a recognized as a distinct race and thus do not enjoy the protection of the statute. Defendant forgets that, although divided on the issue, courts have recognized that discrimination against Hispanics is actionable under § 1981. *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968 (10th Cir.1979) (recognizing the need to include people of Hispanic origin within the protection of § 1981); *Cubas v. Rapid American Corp.*, 420 F.Supp. 663 (E.D.Pa.1976) (Cuban–Americans); *Budinsky v. Corning Glass Works*, 425 F.Supp. 786 (W.D.Pa.1977) (Hispanics); *Gonzalez v. Stanford Applied Engineering, Inc.*, 597 F.2d 1298 (9th Cir.1979) (Mexican–American).

Defendant cites a series of cases for the proposition that Hispanics, as opposed to other groups, do not enjoy the protection of § 1981. Motion In Compliance at pp. 8–10, *citing Davis v. Boyle–Midway, Inc.*, 615 F.Supp. 560 (N.D.Ga.1985) ("... it would be a mistake to conclude from this that all Hispanics, as a group, are subject to racial discrimination."); *Petrone v. City of Reading*, 541 F.Supp. 735 (E.D.Pa.1982) (where there was no allegation that an Italian plaintiff was generally perceived as nonwhite, he could not state a claim under § 1981); and *Martinez v. Hazelton Research Animals Inc.*, 430 F.Supp. 186 (D.Md.1977) ("... this court finds that the allegation that the plaintiff is an Hispanic male, without more, is an insufficient allegation of racial background to support an allegation of racial discrimination and thus fails to state a cause of action under 42 U.S.C.1981.").

As regards these cases, only two remarks need be made by this Court. First, two of the cases are, strictly speaking, inapposite to the case at bar. The *Petrone* and *Martinez* cases only hold that the mere assertion of discrimination on the basis of race is not enough to state a cause of action. In the case at bar, plaintiffs do not allege merely that they were denied access on the basis of their race, they contend that it is the Hotel's policy to exclude visitors on a racial basis. Amended Complaint at par. 19. The *Davis* holding fares no better. The basis for the court's finding that not all Hispanics are the subject of discrimination is that some Hispanics appear and consider themselves white. Therefore, the court surmises, Hispanics, as a group, may not enjoy the protection of § 1981. The court's heavy reliance on the different appearance of Hispanics is no longer persuasive in light of *Saint Francis'* admonition that physiognomic characteristics are no longer the telltale of sign of racial discrimination.[10]

This Court will not engage in a patronizing discourse over what constitutes the physiognomic, social and cultural characteristics that make up and define Puerto Ricans as a distinct race or ethnic group. Suffice it to say that given our rich heritage, Puerto Ricans of all colors, sizes and ethnic backgrounds abound. It is a generally accepted fact, and this Court takes judicial notice, that Puerto Ricans are of Taino Indian, Black, European and, more recently, Anglo–American ancestry (to name a few) and, more often than not, a mixture of two or more of the above. To simplistically and ignorantly argue that "Hispanics are by definition of Spanish or Portuguese descent, and therefore biologically caucasians," *see* Treatise at p 5–55, and to conclude that Puerto Ricans, as a race, admit of a definition of white, is to ignore the obvious.[11]

---

trier of fact may decide. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

**10.** It must also be noted that the *Davis* court noted that the facts before it were distinguishable from those cases where "racial and national origin discrimination are intertwined." *Davis* 615 F.Supp. at 561. As such, its holding is also inapplicable in the case at bar where we explicitly find national, racial and ethnic discrimination irrevocably tied.

**11.** Not only are Puerto Ricans more than just merely Spanish descendants, but Spaniards themselves cannot be said to be strictly Caucasian. To do so would blatantly ignore the control and influence exerted over Spanish territory by Moors for close to 800 years.

We simply re-state that discrimination against Hispanics has been found actionable and that skin color is not determinative. Even if, as defendants propose, "... all Hispanics, as a group, [may not be] subject to racial discrimination," *see* Defendant Motion In Compliance at p. 8, *citing Davis v. Boyle–Midway, Inc.,* 615 F.Supp. 560 (N.D.Ga.1985), Mr. Nogueras may have been the subject of discrimination because of his race—regardless of his color or appearance—because he was identified as a Puerto Rican in just the same manner that the Supreme Court held that Mr. Al-Khazraji could maintain a suit for racial discrimination under § 1981 if he established that he was identified as an Arab by his employer even though he appeared Caucasian. Mr. Nogueras is thus entitled to make his case to the jury.[12]

### 3. Defendant's Appearance

Defendant insists that because plaintiff's appearance is that of a Caucasian,[13] plaintiffs may not bring an action pursuant to § 1981. Defendant candidly admits, however, that the protection against racial discrimination afforded by § 1981 has recently been expanded "beyond persons of the black race." Motion In Compliance at p. 4, *citing, McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (White persons can sue under § 1981 for discrimination against them in favor of a black person). Defendant further recognizes that the Supreme Court in *Saint Francis,* 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1986)

"rejected the position that § 1981 does not encompass claims of discrimination by one caucasian against another." Defendants Motion In Compliance at p. 5.[14]

It is well settled that a person's distinctive physiognomy—one which clearly and unambiguously identifies a person as a member of protected group—is not determinative in § 1981 actions. *Saint Francis,* 481 U.S. 604, 613, 107 S.Ct. 2022, 2028. In *Saint Francis,* respondent, an Arab professor with physiognomic characteristics which rendered him identifiable as a Caucasian, alleged discrimination in the College's decision not to grant him tenure. Petitioner argued that respondent was Caucasian, and therefore could not bring an action under § 1981 against the college or, for that matter, any other Caucasian. The Supreme Court disagreed. It stated:

> Petitioners contend that respondent is a caucasian and cannot allege the kind of discrimination § 1981 forbids. Concededly, *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), held that white persons could maintain a § 1981 suit; but that suit involved alleged discrimination against a white person in favor of a black, and *petitioner submits that the section does not encompass claims of discrimination by one caucasian against another. We are quite sure that the Court of Appeals properly rejected this position.*

481 U.S. at pp. 609–610, 107 S.Ct. at pp. 2026 (emphasis supplied). Moreover, the

---

**12.** It must also be noted that, the Supreme Court has recognized that § 1981 was intended to afford protection to a wide variety of groups including, inter alia, Finns, Gypsies, Basques, Hebrews, Swedes, Norwegians, Germans, Greeks, Italians, Chinese, Irish and French. Without engaging in any further discourse, this Court is of the opinion that if § 1981 applies to all the aforementioned groups, especially Basques and Spanish, there is no reason why it should not protect Puerto Ricans. *See Saint Francis,* 481 U.S. at 611–12, 107 S.Ct. at 2027. Although there is little evidence available, we doubt very much, that in 1866, Congress would have found Puerto Ricans to be Caucasians.

**13.** "Plaintiffs are white, convinced they are of European ancestry, and do not have a skin color

or ethnic characteristics which could be classified into a race (Puerto Rico [sic] ) protected by section 1981. Defendant Motion In Compliance at p. 10.

**14.** Defendant's interpretation of *Saint Francis,* although not incorrect, is slightly off the mark. It is more correct to say that *Saint Francis* stands for the proposition that a person's physical appearance as a caucasian is not determinative in discrimination cases. It is the perception, by the discriminator, of the discriminatees' race that is important for purposes of § 1981. Thus, *Saint Francis* obviates the need to determine the race or ethnicity of the discriminatee and focuses instead on the perception of that person by the discriminator.

Court noted, "Clear cut categories do not exist ... Differences between individuals of the same race are often greater than the differences between average individuals of other races." *Id.* at p. 610, n. 4, 107 S.Ct. at p. 2026, n. 4. The Court concluded that respondent stated a cause of action regardless of his caucasian appearance so long as "on remand [he could] prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981." *Id.,* at p. 613, 107 S.Ct. at p. 2028.

As in the case of Mr. Al-Khazraji in *Saint Francis,* it may be the case that Mr. Nogueras appears Caucasian. In fact, it may even be the case that, following a genealogical study of Mr. Noguera's forbearers, this Court would conclude that he descends from a strictly white European lineage. According to Mr. Nogueras, however, the guard had no difficulty in identifying him as Puerto Rican. In light of *Saint Francis* and its interpretation of *McDonald,* this Court finds that physiognomic characteristics are not determinative and thus plaintiffs may recover if it is established that they were subject to discrimination because they were Puerto Ricans and were identified as such by the entrance guard. *Saint Francis,* 481 U.S. at 609–10, 107 S.Ct. at 2026.

### 4. Intra–Racial Discrimination

Defendants contend that intra-racial discrimination is not actionable under § 1981. In so doing, defendant glosses over decisions that clearly stand for the proposition that intra-racial discrimination is actionable under the statute. *LaFlore v. Emblem Tape & Label Co.,* 448 F.Supp. 824 (D.Colo. 1978) (Intra-racial claims by one caucasian

against another are actionable under § 1981 so long as they flow from racial discrimination), *citing Valdez v. VanLandingham,* No. 76–1373 (10th Cir.1973) (unpublished opinion) (A Caucasian woman married to a Mexican–American may state a cause of action under § 1981 if she is the victim of racial discrimination against her husband); *Walker v. Secretary of Treasury, I.R.S.,* 713 F.Supp. 403 (N.D.Ga. 1989), *modified on other grounds, Walker v. Secretary of Treasury, I.R.S.,* 742 F.Supp. 670 (N.D.Ga.1990). As recognized by *LaFlore* and implicit in *Saint Francis:* "It is irrelevant that the plaintiff is herself Caucasian so long as she was discriminated against as if she belonged to a minority." *LaFlore* at 826. As explained in the Treatise, the *LaFlore* decision "define[s] the statutory term 'white citizens' to mean 'most favored group,' and read section 1981 to entitle all persons to the rights and benefits enjoyed by the most favored." [15] Treatise at p. 5–58, par. 5.09.

This approach represents a re-thinking of how courts go about making a determination of discrimination in a given case. At least two authors have proposed a similar approach in § 1981 cases. *See* Kaufman, A Race By Any Other Name: The interplay Between Ethnicity, National Origin And Race For Purposes Of Section 1981, 28 Ariz.L.Rev. 259 (1986); Comment, Beyond A Black And White Reading Of §§ 1981 and 1982: Shifting The Focus From Racial Status To Racist Acts, 41 U.Miami L.Rev. 823 (1987). Succinctly stated, both articles propose that courts should focus on defendant's perceptions of plaintiff's ethnic and racial differences rather than on plaintiff's racial status. The focus would then shift to the racial content of defendant's actions as a means of ascertaining defendant's perceptions.

---

15. The First Circuit has shown its willingness to transcend race and color based determinations in § 1981 actions by expansively interpreting who may state a cause of action under the statute. In *Des Vergnes v. Seekonk Water District,* 601 F.2d 9 (1st Cir.1979), the court—following a discussion of the Supreme Court's decision in *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (Finding plaintiff, a white person, stated a cause

of action under 1982 where he was discriminated against for assigning of property to a black) and *Dematteis v. Eastman Kodak Co.,* 511 F.2d 306, *modified* 520 F.2d 409 (2nd Cir. 1975)—found that "... to invoke § 1981 or § 1982 one need not be a member of the racial class protected by the statute and one need not even be able to identify any specific member of the class who suffered or may suffer discrimination." *Des Vergnes,* 601 F.2d at 13.

This new approach is consistent with the interpretation given to § 1981 by at least one district court in light of the Supreme Court's decision in *Saint Francis* and the finding in *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) that intra-racial discrimination in favor of another race is actionable. *See Walker v. Secretary of Treasury, I.R.S.*, 713 F.Supp. 403 (N.D.Ga.1989) (Walker I), *modified on other grounds*, in *Walker v. Secretary of the Treasury, I.R.S.*, 742 F.Supp. 670 (N.D.Ga.1990) (Walker II).

In *Walker I*, plaintiff, a light-skinned black person, was terminated pursuant to her supervisor's recommendation, a dark skinned black person. Relying on the assertion in *Saint Francis* to the effect that "a distinctive physiognomy is not essential to qualify for § 1981 protection," *see Walker* 713 F.Supp. at 406, the court concluded that "it is not controlling that in the instant case a black person is suing a black person." *Id.* at p. 408. Interpreting its own precedent, the Georgia District Court has recently read *Walker I* to stand for the proposition that "... intra-racial color discrimination claims are authorized by both title VII and existing Supreme Court precedent." *Walker II*, 742 F.Supp. at 671.

In *McDonald*, petitioners, white employees of a transportation company, were discharged for misappropriating property from their employer. However, a black employee similarly charged was not discharged. Petitioners alleged that respondent discriminated against them on the basis of race in contravention of, inter alia, § 1981. The Supreme Court found that the District Court erred in dismissing petitioners cause of action and held that "§ 1981 is applicable to racial discrimination in private employment against white persons." 427 U.S. at 287, 96 S.Ct. at 2582. Although not stated in so many words, the holding in *McDonald* can be interpreted as recognizing a cause of action under 1981 where a Caucasian discriminates against another of the same race in favor of a Black person. Indeed, this much has been suggested recently in *Saint Francis*, 481 U.S. at 609–10, 107 S.Ct. at 2026 ("... that suit [*Mc-Donald*] involved alleged discrimination against a white person in favor of a black."). This Court agrees with the interpretation of *Saint Francis* as set forth in *Walker I* and *Walker II*.

In our case, we encounter a situation wherein a Puerto Rican allegedly discriminates against another Puerto Rican by allowing access to those whose first language is English and denying entrance to those believed to be Puerto Rican. In light of *Walker I & II, Saint Francis, McDonald* and *LaFlore*, it would be odd to accept that discrimination by a white against another white in favor of a black violates the equal benefit clause but discrimination by a Puerto Rican against a Puerto Rican *in favor of English speaking-persons* (presumably Anglo-American) is not discriminatory or discriminatory but not actionable. Because we find this position untenable, Mr. Nogueras, as did Mr. Al–Khazraji, will be entitled to recovery if he convinces the trier of fact that Puerto Ricans discriminated against him because he was born and identified by the guard as Puerto Rican.

This Court recognizes that prior to the Supreme Court's decision in *Saint Francis*, other courts, scared by the potential task of distinguishing among a myriad of color shades, physiognomic and cultural characteristics, have shied away from grappling with cases that deal with subtle degrees of intra-racial discrimination. *See e.g. Sere v. Board of Trustees, University of Illinois*, 628 F.Supp. 1543, 1546 (N.D.Ill.1986) *dismissed on other grounds*, 852 F.2d 285 (7th Cir.1988) (Courts should not be placed in the "unsavory business of measuring skin color and determining whether the skin pigmentation of the parties insufficiently different to form the bias of a lawsuit.").

This Court agrees with the proposition that courts should not be placed in the "unsavory business" of measuring skin color. We note however, that the holding in *Saint Francis* effectively lays to rest this quandary by eliminating color as a determinative factor. It is true, as defendant points out, that "the Court's opinion [in

*Saint Francis* ] was based on the fact that the term 'race'" is of "doubtful sociological validity." Defendant Motion In Compliance at p. 5. But that· is precisely the import of the decision: the recognition that physiognomic characteristics are no longer considered the indispensable magic recipient for a cause of action under the statute. Rather, it is the subjection of a person to intentional discrimination—because of the belief that he or she belongs to a given race—that renders such behavior actionable.

Because a priori racial categorization is such a hazardous enterprise, this Court follows the Supreme Court's lead in *McDonald* and *Saint Francis* and will focus its attention at trial not on physiognomic characteristics but on defendant's perception of plaintiff as belonging to a given race or ethnic group, in determining whether intra-racial discrimination occurred in the case at bar.

### D. *Respondeat Superior*

■ In their Partial Motion For Reconsideration, defendant contends that even if the guard made the statement attributed to him, plaintiffs may not recover for "they have not set forth (in fact have not even alleged) that defendant is vicariously liable for the alleged statement by the guard." *See* Defendant Partial Motion For Consideration at p. 6. In support of this contention, defendant cites *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). In this respect, defendant is completely off the mark. Plaintiffs do not claim that the guard's alleged discrimination is attributable, on the theory of respondeat superior, to the Hotel management. Rather, they claim that the guard's statement to the effect that management discriminates "against the people of our race," is a statement of undisclosed management policy. If proven true, such statement is evidence of discriminatory intent which is actionable under § 1981. *General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. at 389–91, 102 S.Ct. at 3149–50.

### E. *Hearsay Evidence*

■ As a last ditch effort, defendant also argues that the statement by the guard constitutes inadmissible hearsay evidence. This position conveniently ignores settled rules of evidence, as the statement constitutes an admission against party interest under F.R.E. 804(b)(3), or an admission by party's agent or servant under 801(d)(2)(D).

### F. *42 U.S.C. § 2000a*

The Court reiterates that plaintiff also states a cause of action under 42 U.S.C. § 2000a *et seq.* for the same reasons expressed in its Opinion and Order of September 25, 1990. Defendant's Motion For Partial Reconsideration is therefore denied as it relates both to § 1981 and § 2000a *et seq.* claims.

### G. *Summary*

We sum up briefly. This Court holds that (1) the equal benefits clause of § 1981 provides ample room to accommodate plaintiff's claim that defendant refused them entrance to the Hotel's premises on the basis of race or ethnic background, and (2) that § 1981 has no state action requirement. We find that plaintiffs have alleged sufficient facts that, if proven, constitute not just discrimination on the basis of nationality but also discrimination on the basis of race or ethnic background.

We also find that Puerto Ricans constitute a race or ethnic group for purposes of § 1981 and that plaintiffs physiognomic appearance is not determinative in maintaining a cause of action. More importantly, we hold, in light of the Supreme Court's decision in *Saint Francis,* that the alleged intra-racial discrimination in the case at bar is actionable pursuant to 42 U.S.C. § 1981 and § 2000a *et seq.*

We find that defendant misconstrues the theory of respondeat superior in arguing that the Hotel is not liable for the alleged statement by the entrance guard. Finally, we reiterate our previous unpublished holding that the security guard's statement is admissible as an admission against party

interest or, in the alternative, as an admission by party opponent.

IT IS SO ORDERED.